**Edith LIBUTTI, doing business as Lion Crest Stable, a sole proprietorship, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 94–CV–1114.

United States District Court, N.D. New York.

Aug. 4, 1995.

Miller, Griffin & Marks, Lexington, KY (Michael Meuser, Frank T. Becker, of counsel), Hinman, Howard & Kattell, Binghamton, NY (Paul T. Sheppard, of counsel), for plaintiff.

U.S. Dept. of Justice, Tax Div. Washington, DC (Steven E. Cole, George P. Eliopoulos, of counsel), for U.S.

## MEMORANDUM, DECISION & ORDER

McAVOY, Chief Judge.

### I. BACKGROUND

On July 6, 1994, Edith LiButti, doing business as Lion Crest Stable ("Lion Crest"), brought the racehorse "Devil His Due" to Saratoga, New York to run in the Whitney Handicap on August 27, 1994. On August 25, 1994, the United States Internal Revenue Service (IRS) delivered a Notice of Seizure and Levy to Devil His Due's trainer at Saratoga. The levy was made against Edith Li-Butti d/b/a Lion Crest Stable "as nominee of Robert LiButti to the extent of his interest in the thoroughbred race horse named Devil His Due." The levy sought to seize Devil His Due to satisfy a tax assessment against Robert LiButti.

On August 26, 1994, Lion Crest Stable and the IRS entered into an agreement which allowed Devil His Due to run in the Whitney Handicap. Lion Crest agreed not to file suit against the IRS under 26 U.S.C. § 7426 until August 30, 1994. Any money Devil His Due earned in the Whitney, which amounted to approximately $77,000 due to his second place finish, was to be held in escrow until: (1) the government permitted Lion Crest to withdraw all or some of the earnings; (2) Lion Crest obtained a court order allowing it to withdraw the earnings; or (3) Lion Crest and the government entered into a second agreement with regard to the disposition of earnings.

On September 2, 1994, plaintiff Edith Li-Butti, daughter of Robert LiButti, commenced this action pursuant to 26 U.S.C. § 7426 seeking a permanent injunction barring the IRS from enforcing its levy and seeking a release of the race winnings of

Devil His Due that are being held in escrow by the IRS. She claims to be the sole proprietor of Lion Crest Stable, the purported owner of Devil His Due, and claims that her father has no interest in the horse. Thus, she claims that the levy has been wrongfully placed on her horse.

The court heard a preliminary injunction motion brought by the plaintiff on September 8 and 9, 1994, which essentially sought to lift the levy until such time as the merits of the 26 U.S.C. § 7426 action could be heard. A preliminary injunction was granted which allowed the horse to continue the racing season, but which denied lifting of the levy. The horse has continued to race under agreements between the plaintiff and the IRS.

On October 26, 1994, the government filed suit against Robert Libutti, Joan Libutti (plaintiff's mother), and Edith Libutti in the District of New Jersey. The relief requested in that suit is: (1) to reduce the assessments of Robert Libutti's federal income tax liabilities to judgment; and (2) to foreclose on the federal tax liens which have attached to Devil His Due as a result of such assessments, to sell Devil His Due at foreclosure sale, and to apply the proceeds of such sale to reduce Robert Libutti's outstanding tax liability. The government sought a stay of the Northern District of New York action until final judgment had been entered in the New Jersey action. The court denied this motion.

A three-day bench trial in this action commenced on March 28, 1995. The following is the court's findings of fact and conclusions of law.

## II. LEGAL STANDARD—26 U.S.C. § 7426

26 U.S.C. § 7421 prohibits suits to restrain assessment or collection by the Internal Revenue Service. 26 U.S.C. § 7421(a), however, provides several exceptions to this rule, including allowing suits for wrongful levy pursuant to 26 U.S.C. § 7426. Specifically, § 7426(b)(1) allows a court to enjoin a levy or sale if it determines that the plaintiff has rights in the property superior to the federal tax liens and the levy or sale would irreparably injure those rights.

To prove a wrongful levy, the plaintiff must show that: (1) the IRS filed a levy covering taxpayer liability against property held by the plaintiff; (2) the plaintiff had an interest or lien on that property superior to the government's interest; and (3) the levy was wrongful because the tax debtor does not own the property levied against. *Marshall v. United States*, 831 F.Supp. 988, 997 (E.D.N.Y.1993).

The respective burdens of proof are not disputed by the parties to this action. The initial burden of proof lies with the plaintiff who must "prove title to or an ownership interest in the property levied upon by the Government and that the Government levied upon the property because of a tax assessment against another taxpayer." *Id.* Next, the burden shifts to the government to prove by "substantial evidence" that there is a nexus between the property and the taxpayer. "Substantial evidence" has been deemed by other courts to be "considerably more than a preponderance but less than clear and convincing proof." *Nelson v. United States*, 821 F.Supp. 1496, 1501 (M.D.Ga. 1993). It is the plaintiff's ultimate burden, however, to prove that the levy is wrongful and should be overturned. If the plaintiff fails to support this burden, the levy remains in place. *Id.*

## III. FINDINGS OF FACT

### A. Sales Transactions on Devil His Due

Much of the testimony at trial focused on connections between Edith and Robert Libutti on matters other than the ownership of Devil His Due. The court was presented, however, with the details of various purchase and sales transactions regarding Devil His Due which explain his ownership at the time the levy was attached.

Through Edith LiButti's testimony and various exhibits, including bills of sale and check stubs from Lion Crest Stable's checking account, the acquisition of various interests in Devil His Due can be traced. From this information, it is clear that Edith LiButti first purchased Devil His Due from the Keeneland Sales Company in November 1989 for $25,000. Pltf. Exh. 37. She testified that

she did so against the advice of her father. On February 26, 1990, she sold her 100 percent interest in the horse to George Nejemian, her ex-husband, for $45,000.[1] Nejemian, a chiropractor, then sold interests in the horse to four of his patients, but according to the bills of sale, kept sole responsibility for "any managerial decisions as to the colt's racing career, stud career, or sale." Def. Exh. 139–141. According to these bills of sale, Nejemian sold a 10 percent interest in Devil His Due to Robert McGirr on February 26, 1990, a 25 percent interest to Edward Darella on February 27, 1990, and a 25 percent interest to George and Richard Greeley on February 28, 1990, to be shared equally as 12½ percent interests by each. Def. Exh. 139–141. Nejemian kept a 40 percent interest himself.

In early 1992, Edith LiButti began to reacquire interest in Devil His Due. On February 10, 1992, she regained Nejemian's 40 percent interest in Devil His Due as a trade for her 50 percent interest in a colt of "Turkoman" and "Solicitous."[2] Pltf. Exh. 6. She acquired Darella's 25 percent interest as a trade for her 15 percent interest in the horse "Litigation Rex" on February 13, 1992.[3] Pltf. Exh. 11. She obtained the 10 percent McGirr interest as a trade for a 100 percent interest in the horse "Easy Magic" on February 13, 1992.[4] Pltf. Exh. 18. Over a year later, she acquired the remaining 25 percent interest held by the Greeleys on March 5, 1993 for $100,000. Pltf. Exh. 26–29. She testified that she obtained the money for the purchase of the Greeleys' interests from a friend, John Terranova, who loaned her the money and that she arranged for this loan herself. See Pltf. Exh. 29 (noting a 30-day loan from Terranova).

Check stubs and canceled checks entered into evidence show that Edith LiButti repaid the loan to Terranova on March 24, 1993 after Devil His Due won the Gulfstream Handicap in Florida. See Pltf. Exh. 30–33. Thus, by the end of March 1993, plaintiff had acquired 100 percent ownership of Devil His Due. No further transactions were presented in evidence, and thus, it appears from this information that Edith LiButti was the sole owner of Devil His Due at the time it was levied upon at Saratoga on August 25, 1994.

## B. Additional Evidence of Ownership

Edith LiButti also testified at trial that she has paid all expenses involved in training and upkeep of Devil His Due. She has collected the race proceeds associated with the horse, except for a 25 percent interest owned by the Greeleys during the period when she owned only 75 percent of Devil His Due. The foal certificate issued by the Jockey Club also lists full ownership in Edith LiButti/Lion Crest Stable. Pltf. Exh. 1.

Deposition testimony by Allen Jerkens, the trainer of Devil His Due, shows that he discussed jockeys for Devil His Due with Edith LiButti and generally spoke with her "a couple of times a week" when the horse began to race. Allen Jerkens Dep. at 47. He also stated that he always refers those who approach him regarding the sale of Devil His Due to Edith. Id. at 59. Mr. Jerkens' deposition testimony also shows that Edith LiButti owned Litigation Rex and Easy Magic, interests in which she sold to repurchase Devil His Due. Id. at 53–57. His wife, Elizabeth Jerkens, who performs the bookkeeping for the H.A. Jerkens training business, testified in deposition that she has discussed any outstanding bills for Lion Crest Stable with Edith LiButti. Elizabeth Jerkens Dep. at 119–121.

George Greeley, who was part owner of Devil His Due, testified that he contacted

---

1. Trial exhibits and testimony by Edith LiButti show that she and George Nejemian had been separated since 1987 and that, at various times since, their relationship had been quite antagonistic.

2. Evidence at trial showed that she had acquired ownership interest in the Turkoman/Solicitous colt by purchasing the colt from Gerald Gallo on March 25, 1991 for $20,000. Pltf. Exh. 7–8.

3. Edith LiButti testified that she owned a 100 percent interest in Litigation Rex and that her mother, Joan LiButti had purchased the horse for her with funds loaned to her by Edith LiButti.

4. Edith LiButti testified that she had a 100 percent ownership interest in Easy Magic which Allen Jerkens had purchased for her at a sale for $50,000 in May 1991. See Pltf. Exh. 19–22.

Edith LiButti in relation to his concerns about the horse's performance. George Greeley Dep. at 70–73. He also testified that although he spoke to Robert LiButti on the phone on a number of occasions it was in the context of leaving messages for Edith. *Id.* at 54–55.

### C. Welch Testimony

The government introduced one witness at trial, Stewart Welch, who testified as to a telephone conversation with a woman who identified herself as Edith LiButti. He testified that during this conversation she said that her father had an ownership interest in Devil His Due. According to his testimony, Stewart Welch, a bloodstock agent, became interested in purchasing an interest in Devil His Due in January 1994. After discussions with Allen Jerkens, the horse's trainer, he then called Edith LiButti "probably within the day" he talked to Jerkens, to inquire if the horse was for sale. Trial Trans., Mar. 30, 1995 at 567. He said that the conversation lasted for a "couple of minutes." *Id.* at 570. He testified that upon inquiring as to the current owners of the horse, Ms. LiButti answered that she, Robert LiButti, and Bob Fox had ownership interests. She told him that a 25 percent interest in Devil His Due was for sale for approximately $700,000. She told him to call Bob Fox regarding the possibility of a sale.

In a telephone conversation with Bob Fox, Mr. Welch was told that a 25 percent interest would cost $750,000 and that the contract was to be to be made out to Lion Crest Stable. Mr. Welch testified that he believed Bob Fox to have an agency interest in Devil His Due. Mr. Welch faxed Bob Fox a copy of the sale agreement for a 25 percent interest in Devil His Due. Def. Exh. 295. The agreement clearly lists Bob Fox as the agent for Lion Crest Stable. Mr. Welch testified that he did not hear from Bob Fox regarding the contract after that, but he ran into him a few days later and Fox informed him that he had not signed the contract in order to be able to sell the horse elsewhere. He had further phone conversations with Bob Fox regarding another horse, but never discussed Devil His Due with him again.

Mr. Welch testified that he called the government voluntarily after reading about this lawsuit in an article in the Daily Racing Form. Mr. Welch testified that he had inquired about the owners of the horse because he had "been burned a couple times on ownership on a horse." Trial Trans., Mar. 30, 1995 at 569. The contract for Devil His Due, however, only listed Bob Fox, agent for Lion Crest and did not require signatures by anyone other than Fox on behalf of the sellers of the interest. Def. Exh. 295. Additionally, no telephone records of these conversations were admitted into evidence. Mr. Welch's testimony does not show that he sought proof of Devil His Due's ownership from anyone. Essentially, this brief conversation between strangers is the only evidence presented by the government that Robert LiButti had an ownership interest in Devil His Due. Notably, this testimony did not show what percentage of ownership Robert LiButti held in Devil His Due.

### D. Testimony of Susan Grant

In order to trace funds in the Lion Crest Stable checking account, the government called as a witness Susan Grant, an IRS agent who examines tax returns for accuracy as part of her job. She had been assigned to the tax case against Robert LiButti since late 1989. In preparation for the criminal trial against Robert LiButti, she had reviewed canceled checks and statements from the account of Buck Chance Stable, owned by Robert LiButti, and the account of Lion Crest Stable.

She testified to the fact that just prior to Lion Crest's 1989 purchase of Devil His Due, Robert LiButti deposited two checks in the amounts of $85,000 and $100,000 into Lion Crest's bank account. However, she also testified that the charts she prepared for tracing the ownership of the horse did not show how these funds were commingled in the account with other money. This same deficiency attaches to the other tracings done by Ms. Grant used by the government in an attempt to show that Robert LiButti is the true owner of Devil His Due. Additionally, Ms. Grant noted at the time Robert LiButti deposited the two checks into the Lion Crest

account, he owed a loan balance of over $800,000 to Edith LiButti. These checks were credited against the loan balance. *See* Def. Exh. 221A.

### E. Joan LiButti's Security Interest in Devil His Due

Ms. Grant also testified as to a security interest in the breeding rights of Devil His Due held by Joan LiButti, Edith's mother. It is clear that in April 1992, Edith LiButti granted Joan LiButti a 75 percent interest in the breeding rights of Devil His Due. Def. Exh. 93. Ms. Grant also testified that in November 1991, Joan LiButti actually owed money to Edith, a condition that existed during most periods Ms. Grant investigated. *See* Def. Exh. 224A. Since the summary of loan transactions shows that none occurred between Joan and Edith LiButti in 1992, the court can infer from the evidence that the $70,000 loan balance owed by Joan to Edith LiButti as of October 13, 1991 remained unchanged during 1992 when the security interest was executed. *See* Def. Exh. 224A. The security interest has since been released.

Edith LiButti testified in a deposition that this security interest was executed even though her mother owed money to her. Def. Exh. 8 at 240. The court does find this situation unusual given the fact that Joan LiButti owed money to Edith LiButti. However, the peculiarity of this transaction does not present evidence that Robert LiButti was involved in the transaction or that it gave Robert LiButti any ownership interest in Devil His Due. In fact, the only evidence the government has pointed to in an attempt to show Robert LiButti's involvement is the fact that Joan LiButti testified at deposition that if she needed to know exactly when she received the security interest for the breeding rights of Devil His Due, she answered that she might ask her husband or her lawyer. Joan LiButti Dep. at 44. This statement is not sufficient evidence from which to infer that Robert LiButti was involved in the transaction.

### F. Evidence of Other Financial Ties

The government also entered into evidence a wide variety of information showing links between Edith and Robert LiButti in financial transactions. For example, the government presented evidence regarding transactions at the Urban National Bank during the 1980s, the transactions surrounding the purchase of a home at 2 Pell Farm Road, transactions surrounding the ownership and lease of several horses during the 1980s, and the purchase of horses by Robert LiButti at a July 1988 Keeneland sale. Evidence of these transactions was obviously presented to show an ongoing financial relationship between Edith and Robert LiButti, and to attempt to show that Robert LiButti had general control over Lion Crest Stable.

The evidence did show that Edith and Robert LiButti have had numerous financial dealings. However, this evidence does not show any connection between Robert LiButti and Devil His Due, the property in question.

#### 1. 2 Pell Farm Road Property

The government presented evidence regarding the purchase of a house at 2 Pell Farm Road, Saddle River, New Jersey in 1989. The house was purchased in Edith LiButti's name and the office for Lion Crest Stable was located there. Edith LiButti testified at trial that she never lived in the house, but her mother did, and her father did occasionally. She also testified in grand jury proceedings that she owned the house in name only. Edith LiButti testified at trial that the house was leased before it was purchased and that her father negotiated the lease although it was in her name. The rent payments were drawn from the Lion Crest Stable account.

Edith LiButti's trial testimony showed that the check from Lion Crest Stable to buy a purchase option for the house bounced and that her father then paid $150,000 for it.[5] Additionally, Robert LiButti entered into a contract with Saddle River Associates selling his horse "Lady Romanee" for $400,000 as a downpayment on the house. Def. Exh. 249,

---

5. Susan Grant's testimony also sets forth the deposit of checks made payable to Robert LiButti to Edith LiButti's racing account around the time of the purchase of the house. *See* Def. Exh. 507.

250. He then assigned all interests in this credit to Edith LiButti, the contract noting that this would reduce his loan balance with Edith by $400,000. Def. Exh. 251. He also executed a contract with Saddle River Associates agreeing to take back Lady Romanee by December 31, 1989, in return for $400,000 plus any accrued expenses. Def. Exh. 252. Her father also handled and decided on certain construction projects for the house.

This information clearly shows a tight financial connection between Robert and Edith LiButti regarding the purchase of the 2 Pell Farm Road house. However, Edith LiButti testified that after this, she paid taxes and payments on the house with all the money coming from Lion Crest accounts. In light of all this evidence, the court clearly finds a nexus between Robert LiButti and the 2 Pell Farm Road property. However, this nexus does not establish any nexus between Robert LiButti and Devil His Due.

### 2. Urban National Bank Transactions

The government also presented evidence that, during the 1980s, Edith LiButti signed a number of promissory notes and checks at Urban National Bank, some of which were blank when she signed them, at the direction of Ted Kruckel, the bank's president. Her testimony shows that she did not review the documents before signing them and that she did not know their contents. The plaintiff agrees that there is also no question that Robert LiButti directed a bank employee, Delores Berger, to endorse a number of checks with Edith LiButti's signature. Robert LiButti also instructed Ms. Berger to prepare some bills of sale and other documents for horse transactions. Ms. Berger testified that on certain occasions she signed Edith LiButti's name on such bills of sale and other documents at Robert LiButti's direction after he told her that Edith was not available to do so. Ms. Berger testified at trial that Robert LiButti came to the bank to transact business for Lion Crest Stable as well as his own Buck Chance Stable. She also noted, however, that Robert LiButti was not a signator on Edith LiButti's or Lion

Crest's accounts and that Robert LiButti never received cash from such accounts.

Trial testimony by Susan Grant also showed that loans were then made by Urban National Bank to Edith LiButti and that five of these loans remain partially outstanding, but have been consolidated into three notes. Def. Exh. 223A. According to the testimony of Susan Grant, Lion Crest used the proceeds of these loans to purchase horses, then sold these horses and deposited the sale proceeds into Lion Crest's checking account. *See* Def. Exh. 218A. However, none of these horses was Devil His Due. The government made no connection at trial between these funds and those used to purchase Devil His Due. Notably, these transactions took place between 1985 and 1987 and Devil His Due was not purchased initially until November 1989.

### 3. Lease Arrangements on Certain Horses

The government also showed evidence of lease agreements between Ted Kruckel, the President of Urban National Bank, and Lion Crest Stable between 1985 and 1987. The government showed that such agreements were entered into for the horses "Groovy," "Cutlass Reality," and "Belle Notte." Edith LiButti testified that such leases existed, although no documentation of such leases was produced. The government's exhibits do show three sets of bills of sale for Groovy, Cutlass Reality, and Belle Notte through which Lion Crest sold the horses to Ted Kruckel. Shortly thereafter, Ted Kruckel executed bills of sale back to Lion Crest for the same amount as the purchase price. Def. Exh. 17–18, 26–29. In the case of Groovy, the Jockey Club certificate never showed the resale to Lion Crest and the horse raced under Ted Kruckel's name.[6] Def. Exh. 11.

Nonetheless, the government provided no evidence that any such arrangement was made as to Devil His Due. The government provided no evidence that Ted Kruckel, Delores Berger, or anyone at Urban National Bank had any connection with Devil His Due. There is no evidence of forged checks, relat-

---

6. However, as the plaintiff pointed out at trial, the bill of sale transferring Groovy back to Lion Crest was never signed by anyone representing Lion Crest, and Edith LiButti testified that she assumed that Ted Kruckel continued to own the horse. Def. Exh. 18.

ed bills of sale, or lease agreements in regard to the property at issue.

### 4. Purchase of "Slick"

The government also asserts that a nexus is shown by the fact that, in July 1986, Lion Crest Stable purchased a horse named "Slick" from the Keeneland Association and that it sold the horse to Robert LiButti on March 18, 1987 for $400,000. The same day, Robert LiButti sold the horse to an individual named John Ballis for $1,000,000. As a result, Robert LiButti's loan balance to Edith LiButti was increased by $400,000. The court cannot draw any inference from this information showing a connection between Robert LiButti and Devil His Due.

## IV. CONCLUSIONS OF LAW

### A. Fifth Amendment Privilege

Before discussing the legal theories of the case, it is necessary to discuss the government's assertion that because Robert LiButti invoked his Fifth Amendment privileges during his deposition in this action, the court must infer that his testimony would be adverse to Edith LiButti and must infer that it would serve to make a substantial connection between Robert LiButti, Lion Crest Stable, and Devil His Due. The government asserts that his refusal to testify by itself, and when taken together with other evidence on the record, establishes the required nexus between him and Devil His Due. The government requests specifically, that adverse inferences be drawn against Edith LiButti because of her father's failure to testify.

The Supreme Court has held that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810 (1976). The Supreme Court has since noted that *"Baxter* did no more than permit an inference to be drawn in a civil case from a party's refusal to testify" and that such silence "was only one of a number of factors to be considered by the finder of fact in assessing a penalty." *Lefkowitz v. Cunningham,* 431 U.S. 801, 808

n. 5, 97 S.Ct. 2132, 2137 n. 5, 53 L.Ed.2d 1 (1977).

The Second Circuit has noted that, a bright line rule against drawing inferences due to the invocation of the Fifth Amendment is undesirable in civil cases, and unlike in criminal cases, in civil cases, "there is generally no constitutional interest underlying a particular claim of privilege; the calculus of interests is therefore all the more difficult." *Brink's Inc. v. City of New York,* 717 F.2d 700, 709 (2d Cir.1983). However, the Second Circuit has permitted, but not required, a negative interest to be drawn against a *party* due to his invocation of his Fifth Amendment privilege. *Machado v. Commanding Officer,* 860 F.2d 542, 544–45 (2d Cir.1988). Additionally, it has been held that "it is unlikely that the refusal to testify alone could support an adverse finding [against the party refusing to testify]." *RSO Records, Inc. v. Peri,* 596 F.Supp. 849, 857 (S.D.N.Y.1984). The court finds that based on this precedent, it is far less likely to be proper to allow a *non-party's* refusal to testify to be the only support for an adverse inference against a party to the suit.

Relying on *Brink's Inc., supra,* the government claims that a negative inference may be drawn against a party when a witness closely identified with that party refuses to testify. The government cites to similar cases from the Third and Eighth Circuit Courts of Appeals. The court, however, finds these cases inapplicable to the one at hand because two of the cases involved former corporate personnel who invoked the Fifth Amendment regarding matters within their employment, and accordingly, the courts allowed the witnesses' silence to act as a negative inference against the corporate party. *See Rad Services, Inc. v. Aetna Casualty & Sur. Co.,* 808 F.2d 271, 275 (3d Cir.1986); *Brink's Inc.,* 717 F.2d at 710 (also noting the unusual situation in that case because the witnesses in question were parties to a third-party claim, thus creating conflicting interests for Brink's). Similarly, in another case cited by the government, *Cerro Gordo Charity v. Fireman's Fund Am. Life Ins. Co.,* 819 F.2d 1471, 1481–82 (8th Cir.1987), the Court of Appeals approved the trial court's decision to permit the

insurance company defendant to call a former voting member of the plaintiff charity to the witness stand so that he could invoke the Fifth Amendment in front of the jury. It did not hold that a court, in deciding a bench trial, is required to draw a negative inference against a non-party witness who has invoked the Fifth Amendment. *See also Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509, 522 (8th Cir.1984) (also holding simply that "under certain circumstances, a party may call a witness to the stand even when that witness has made known an intention to invoke the Fifth Amendment" and noting that the court was not creating a bright line rule on the issue). The court does not see how these cases have any application to the situation at hand.

■ The government has not provided any cases in which a non-party witness' invocation of his Fifth Amendment privilege has resulted in drawing an adverse interest against a party where the non-party witness was not in some way a former member or employee of the party at issue. Additionally, the Second Circuit has held in a case where a non-party, who did not have a former member or employee relationship with the party at issue, invoked his Fifth Amendment privilege that "no adverse interest against appellees could have been drawn by his refusal to testify." *Brenner v. World Boxing Council*, 675 F.2d 445, 454 n. 7 (2d Cir.1982). Thus, the court in this case, refuses to draw an adverse inference against Edith LiButti because of Robert LiButti's assertion of his Fifth Amendment privileges.

### B. Choice of Law

Although the government has apparently ignored the issue, each of the legal theories on which it relies must be determined on the basis of state law. Nonetheless, the government has not made any argument about which state's law should apply in this action.

■ Because this is a federal question action, the court must use a federal common law choice of law rule in order to decide which state's substantive law governs the purported legal theories at issue. *Corporacion Venezolana de Fomento v. Vintero Sales Corp.*, 629 F.2d 786, 795 (2d Cir.1980). Following the federal choice of law rule, the Second Circuit has applied the law of the jurisdiction with the greatest interest in the substantive legal claim at hand. *Id.* at 795.

■ In this case, although the levy was placed on the horse while it was in New York, this state does not appear to have an interest under any of the legal theories advanced by the government. New Jersey, on the other hand, has a strong interest in light of the theories the government is advancing. Since the government is arguing that Robert LiButti held an interest in Devil His Due because of connections to Lion Crest Stable, a New Jersey entity, and because Edith and Robert LiButti reside in New Jersey, it has an interest in the action. Thus, the court will apply New Jersey law, when possible, to these claims.

### C. Plaintiff's Initial Burden

The government notes in its post-trial memorandum that it does not dispute, according to the form of the transactions at issue, that plaintiff has met her initial burden of establishing title to the property levied upon. The court, therefore, deems this established and turns to an examination of the government's burden to show a connection between Robert LiButti, the taxpayer, and the property levied upon, Devil His Due.

### D. Government's Burden

As noted before, once the plaintiff has met her initial burden, the government must then prove a nexus between the taxpayer and the property levied upon by "substantial evidence." "Substantial evidence" has been deemed by other courts to be "considerably more than a preponderance but less than clear and convincing proof." *Nelson*, 821 F.Supp. at 1501. This court uses the same standard.

#### 1. Nominee Theory

As stated previously, the court should apply New Jersey law regarding nominee relationships to analyze the possibility of such a relationship between Edith and Robert LiButti. *See Hill v. United States*, 844 F.Supp. 263, 270 (W.D.N.C.1993) (noting that the

court must apply state law to determine whether a nominee relationship exists). However, courts have not followed state law when no case law on what factors to apply can be found. *See Towe Antique Ford Found. v. IRS*, 791 F.Supp. 1450, 1454 (D.Mont.1992) (applying the test for nominees used by other courts when no applicable law from the appropriate state could be found). Having found no reported cases addressing the factors relevant to the nominee theory from New Jersey, the court uses the factors considered by other courts and agreed to by the parties in this action.

■ As noted in the caption of this action, the levy was issued against the plaintiff "as nominee of Robert LiButti." The government claims that the proof at trial supports that Devil His Due is being held by Edith LiButti, doing business as Lion Crest Stable, as a nominee of Robert LiButti. The parties do not contest that in order to establish that property is held by a nominee the court must consider six factors: (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and transferor; (4) whether the they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property. *Id.*

■ Applying these factors to the case at hand, the government has not shown substantial evidence to support the nominee theory. Most importantly, the government did not provide any proof that there was a transfer of Devil His Due from Robert to Edith LiButti. The court finds that the government's proof showed a close relationship between these individuals. However, the other factors have not been supported.

### 2. Fraudulent Conveyance Theory

The government lists fraudulent conveyance among the defenses set forth in its

amended answer. However, as just noted, since none of the proof at trial supported that Devil His Due was conveyed from Robert to Edith LiButti, any argument of this theory is meritless.

### 3. Alter Ego Theory

The government argues that the proof at trial shows that Robert LiButti is the alter ego of Lion Crest Stable, and thus, since Devil His Due is purportedly owned by Lion Crest, the horse is the property of Robert LiButti. Alter ego doctrine commonly arises in the context of a creditor's efforts to pierce a corporate veil, and the government clearly relies on the principle of "piercing the corporate veil" in this action. *See* Def. Pretrial Memo. at 40.

■ New Jersey law clearly allows piercing of the corporate veil when that theory is legally applicable. The court has found a wide variety of New Jersey case law in which individuals have been found to be the alter egos of corporations. *See, e.g., Coppa v. Taxation Div. Director*, 8 N.J. Tax 236, 239 (N.J. Tax Ct.1986); *Laborers' Local Union Nos. 472 & 172 v. Interstate Curb & Sidewalk*, 90 N.J. 456, 448 A.2d 980, 982 (1982); *McKee v. Harris–Seybold Co.*, 109 N.J.Super. 555, 264 A.2d 98, 108 (1970). However, the case at hand involves a sole proprietorship rather than a corporation, and after an exhaustive search of New Jersey case law, the court cannot find any legal authority for the government's proposal that the court apply the alter ego doctrine to a sole proprietorship. While it is clear that New Jersey does not consider the sole proprietorship entity to be the exact legal equivalent of the natural person behind the business, *see, e.g., In re Grand Jury Proceedings of Guarino*, 104 N.J. 218, 516 A.2d 1063, 1064 (1986) (holding that the Fifth Amendment privileges of an individual do not extend to the business records of his sole proprietorship), the court can find no New Jersey legal authority for the proposition that a sole proprietorship may be subject to the alter ego doctrine.[7] Thus, the court rejects this line of

---

7. While the court has noted, *supra*, that it may look to other courts for applicable legal standards when no relevant case law from the appro-

priate state can be found, the cases cited to by the government in support of its argument that the alter ego doctrine may be applied to non-

argument by the government and does not find Robert LiButti to be the alter ego of Lion Crest Stable.

### 4. Lien on Going Concern Theory

■ The government also briefly states within its alter ego argument that even if it was found that Robert LiButti no longer controlled Lion Crest, "the tax liens attached to Lion Crest's property and value as a going concern upon the assessment." Def. Pretrial Memo. at 41. It is clear that the first tax assessments against Robert LiButti were made in 1986. The government thus asserts the theory that the lien attached in 1986 continues today. However, as the plaintiff points out, under its terms, the 1986 lien expired in 1992, prior to the levy in this case. Thus, although the government refiled the notice of lien in August 1994, any lien on Lion Crest Stable as a going concern had already expired. Preliminary Inj. Hearing, Def. Exh. 3 at 1–4.

### 5. Constructive Trust Theory

The government also argues that even if Robert LiButti relinquished any active and substantial control that he held over Lion Crest Stable, the levy is valid against Devil His Due because Lion Crest holds title to the horse as a constructive trustee for the creditors of Robert LiButti. The government claims that the proof at trial shows that Robert LiButti retains equitable interests in Lion Crest. The government argues, "courts must impose a constructive trust with respect to fraudulently conveyed property in order to preclude any further harm to the transferor's creditors, and because the transferee cannot possibly maintain the right to proceeds from property the title to which they should never have obtained in the first place." Def. Pretrial Memo. at 42–43. How-

ever, it is clear from the government's argument, that this theory of constructive trust relies strongly on the court's finding that Robert LiButti is, or at one time was, the alter ego of Lion Crest Stable.[8] *See id.* at 43. Since the court has rejected the alter ego argument, it too must reject the constructive trust theory.

### E. Plaintiff's Ultimate Burden of Proof

As stated previously, the government must support a nexus between the taxpayer and the property at issue by "substantial evidence." Based on the foregoing, the court finds that the government has not supported its burden. Based on the facts presented by the plaintiff, however, especially as discussed previously in Section IIIA and IIIB of this decision, the court finds that plaintiff has met her ultimate burden of proving that the levy is wrongful. *See Century Hotels v. United States,* 952 F.2d 107, 109 (5th Cir.1992) (stating that "if the IRS proved a nexus by substantial evidence, [the plaintiff] then had the ultimate burden of proving the levy was wrongful").

## V. CONCLUSION

In conclusion, the court holds that the plaintiff has supported her burden of proof while the government has not, and thus, the levy placed on Devil His Due is wrongful. The court hereby orders that the levy placed on Devil His Due on August 25, 1994 be lifted and that the IRS be permanently enjoined from enforcing such levy.

### IT IS SO ORDERED.

---

corporate entities is entirely based on state law from Michigan and South Dakota. *See Comer Family Equity Trust v. United States,* 732 F.Supp. 755, 759 (E.D.Mich.1990); *Loving Saviour Church v. United States,* 556 F.Supp. 688, 690–91 (D.S.D.1983). The laws of these states are clearly inapplicable here and the court, therefore, declines to follow these cases.

8. The government's pretrial argument states that:

The United States believes that the evidence will establish that Robert LiButti is the alter ego of Lion Crest. To the extent that the plaintiff can establish that Robert LiButti has relinquished his active and substantial control (which we strongly dispute), the levy is nevertheless valid against DEVIL HIS DUE, which Lion Crest holds title to as a constructive trustee for the creditors of Robert LiButti.
Def. Pretrial Memo. at 43.