### Edith LiBUTTI d/b/a Lion Crest Stable, Plaintiff,

v.

### UNITED STATES of America, Defendant.

### No. 94–CV–1114.

United States District Court,
N.D. New York.

July 2, 1997.

Hinman, Howard & Kattel, LLP, Binghamton, NY, for plaintiff; Paul T. Sheppard, of counsel.

Miller, Griffin & Marks, Lexington, KY, for plaintiff; Michael D. Meuser, Frank T. Becker, of counsel.

George P. Eliopoulos, Trial Atty., Kenneth W. Rosenberg, United States Department of Justice, Tax Division, Washington, DC, for defendant; William S. Estabrook, Thomas J. Clark, Gary R. Allen, of counsel.

## MEMORANDUM DECISION & ORDER

McAVOY, Chief Judge.

### I.  PROCEDURAL HISTORY

This matter comes before the Court on remand from the Second Circuit. The issue on appeal concerned a permanent injunction issued by this Court pursuant to 26 U.S.C. § 7426. *See LiButti v. United States*, 894 F.Supp. 589, 591 (N.D.N.Y.1995). The injunction barred defendant Internal Revenue Service ("IRS") from enforcing a tax levy against plaintiff Lion Crest Stables ("Lion Crest") and Devil His Due, a racehorse allegedly owned by plaintiff Edith LiButti ("Edith"), and ordered the release of $77,000 in prize money the horse earned through its second-place finish at Saratoga Racetrack's Whitney Handicap in 1994. In light of the guidance recently provided by the Circuit,

the Court now reconsiders the merits of the injunction.

## II. FACTUAL HISTORY

In 1977, Robert LiButti ("Robert") was convicted of filing false tax returns. Thereafter, the IRS assessed unpaid income taxes against Robert (whose August 1994 balance totaled $4,395,162.06). Unable to locate any assets in his name, the IRS issued a levy against prized thoroughbred Devil His Due, believing Robert to be the effective owner of the horse held in the name of his daughter Edith's Lion Crest Stable. Edith then brought a wrongful levy action against the IRS pursuant to 26 U.S.C. § 7426 to enjoin it from enforcing the levy against Devil His Due and to gain the release of the horse's 1994 Whitney Handicap winnings. *See LiButti*, 894 F.Supp. at 591.

In determining whether an injunction should be issued, this Court concerned itself with three issues: (1) whether Lion Crest was an operational business; (2) if so, whether the horse was one of Lion Crest's assets; and (3) if so, whether Robert was Lion Crest's effective owner, and in an effort to conceal his ownership made Edith the business' nominee. The Court found that the IRS proved the first two elements for an injunction, but not the third.

First, the IRS showed Lion Crest was an operational business by providing evidence of Lion Crest's financial transactions and showing that Edith filed her claim as "Edith LiButti, doing business as Lion Crest Stables." Second, the IRS proved Lion Crest owned Devil His Due by producing a 1994 foal certificate issued by the Jockey Club at Saratoga that listed Edith LiButti/Lion Crest Stable as the horse's full owner. The Court, however, found that the IRS had not proven the third element, that Robert *actually* transferred the horse to Edith or provided the money Edith used to purchase Devil His Due. *See LiButti*, 894 F.Supp. 589, 591. On appeal, the Circuit determined that government did not have the burden of showing a money trail from Robert to Devil His Due. *See LiButti v. United States*, 107 F.3d 110, 119 (2d Cir.1997). Rather, the Circuit stated that it would be sufficient for the government to show that Robert effectively owned Lion Crest and controlled its finances. *See Id.*

The IRS produced evidence indicating that Edith served as Robert's financial conduit by showing: (1) Edith asserted that she and Lion Crest were destitute shortly before Devil His Due was purchased; (2) Edith did not know the source of the funds she used to start Lion Crest; (3) Edith did not know the purpose/use of millions of dollars of loans signed in her name; and (4) Edith did not know so much as whether the business was incorporated or not. Moreover, the IRS showed: (1) Lion Crest carried $1,013,572.64 in loans for Robert from 1984–92; (2) Robert was actively involved in the sale and management of the stable's horses; and (3) Robert expended Lion Crest funds for his personal use.

The Court's finding that the IRS could not show whether any of Robert's money went to the purchase of Devil His Due itself, or effectuated Lion Crest's operation, primarily was due to the fact that Robert invoked his Fifth Amendment privilege against self-incrimination to eighty-four questions posed during his deposition. Because Robert refused to answer any questions about his involvement with Lion Crest or Devil His Due, and the Court declined to draw any adverse inferences from Robert's invocation, the IRS could not establish a nexus between him and Lion Crest /Devil His Due. Therefore, the Court granted Edith's request for an injunction.

Since then, the Second Circuit has also determined that adverse inferences drawn from non-party witnesses' refusal to answer questions in civil proceedings are admissible. *See Id.* at 121. Thus, this Court must decide two issues on remand: (1) to what extent adverse inferences should be drawn with respect to Robert's refusal to answer questions concerning whether he or Edith was the effective owner of Lion Crest and/or Devil His Due; and (2) what weight to give such inferences.

## III. DISCUSSION

### A. Extent to Which Adverse Inferences Should Be Drawn

■ The Fifth Amendment precludes courts from drawing inferences adverse to

defendants in criminal cases, but it "does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." *See Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). In *RAD Servs., Inc. v. Aetna Casualty & Sur. Co.,* 808 F.2d 271, 275 (3d Cir. 1986), the Third Circuit expanded this concept by holding that "[a] non-party's silence in a civil proceeding implicates Fifth Amendment concerns to an even lesser degree."

While the Second Circuit has noted that the "law pertaining to adverse inferences" is "undeveloped," it nevertheless iterated the rationale adopted in *Brink's Inc. v. City of New York,* 717 F.2d 700 (2d Cir.1983), that "refusals to testify could appropriately be conceptualized 'as vicarious admissions.'" *See LiButti,* 107 F.3d at 120–21, *quoting Brink's Inc. v. City of New York,* 717 F.2d 700 (2d Cir.1983). Drawing on *Brink's* instruction that any "bright line rule against drawing inferences from a failure to testify" is undesirable, the Circuit in *LiButti* fashioned a rule from cases decided in three other Circuits that required a multi-factored case-by-case determination as to "the admissibility of a non-party's invocation of the Fifth Amendment privilege against self-incrimination in the course of civil litigation and the concomitant drawing of adverse inferences." *See Brinks,* 717 F.2d at 708; *LiButti,* 107 F.3d at 125. Thus, the Second Circuit instructs that the "circumstances of a given case, rather than the status of a particular non-party witness, is the admissibility determinant." *See LiButti,* at 121.

■ The Second Circuit remanded with the instruction to determine the admissibility of adverse inferences drawn from a non-party witness' invocation of the privilege against self-incrimination in a civil proceeding in light of four nonexclusive factors: (1) the nature of the relevant relationships; (2) the degree of control the party vests in the non-party witness with regard to key facts and the subject matter of the litigation; (3) the compatibility of the interests of the party and non-party witnesses in the outcome of the litigation; and (4) the role of the non-party witness in the litigation. *See Id.* at

123–24. As set forth below, under the circumstances of the instant case, these factors compel the admissibility of adverse inferences drawn from Robert's refusal to answer questions about whether he or Edith was the effective owner of Lion Crest and/or Devil His Due.

### i. Nature of the Relevant Relationship

This Court found during its previous consideration of this matter that the government showed a close relationship between Robert and his daughter Edith. *See LiButti v. United States,* 894 F.Supp. at 598. Therefore, the Court will not revisit this issue.

### ii. Degree of Control the Party Vests in the Non-party Witness With Regard to Key Facts and the Subject Matter of the Litigation

■ A non-party witness' decision to invoke the privilege against self-incrimination can be treated as a vicarious admission if a party has vested a high degree of control in a non-party witness with regard to key facts and subject matter of the litigation. *See LiButti,* 107 F.3d at 123 *citing with approval* Robert Heidt, *The Conjurer's Circle—The Fifth Amendment Privilege in Civil Cases,* 91 YALE L.J. at 1119–20 n. 214. In the instant case, the evidence showed that Robert consistently borrowed money from Urban National Bank in Edith's name to fund Lion Crest's horse purchases. Furthermore, testimony established that Robert held an ownership interest in Devil His Due and that he negotiated its 1990 sale to George Namejian. Moreover, evidence showed that Robert used Lion Crest's bank accounts as his own and that he made all decisions affecting the care, sale, and purchase of Lion Crest's horses.

Based on these findings, the Court concludes that Edith vested in Robert a great degree of control over the subject matter in this litigation, to wit, effective ownership of Lion Crest and Devil His Due.

### iii. Compatibility of Party and Non-party Witnesses Interests

In order to protect the Whitney Handicap winnings and Devil His Due against the

IRS's levy, Edith had an interest in proving that she exclusively owned Lion Crest and Devil His Due. Furthermore, given the IRS's substantial tax lien against Robert, Robert had an interest in proving he did not own Devil His Due or Lion Crest since establishing Robert's ownership of these assets would expose them to the government's levy. Thus, Edith and Robert had the mutual interest of proving that Robert did not own either Lion Crest or Devil His Due.

### iv. Role of the Non-party Witness in the Litigation

Robert has played a leading role in the management and acquisition of Lion Crest's assets from the time Edith was seventeen and began Lion Crest with sums of unknown origin. Thus, in the instant action, where the imposition of a multimillion dollar levy depends on whether Robert or Edith own Lion Crest and its horses, Robert unquestionably remains is a dominant figure. As such, the record clearly indicates that Robert, though not a captioned party, occupies a controlling role in the instant case. Therefore, this factor also militates in favor of drawing adverse inferences from Robert's refusal to answer questions.

Above and beyond these four factors, the Court's ultimate concern is whether an adverse inference is "trustworthy under all of the circumstances and will advance the search for truth." *See LiButti*, 107 F.3d at 123–24. Based on the foregoing, this Court concludes that adverse inferences drawn from Robert's refusal to answer questions under the circumstances of this case satisfies both goals. The Court finds that drawing adverse inferences from Robert's refusal to answer questions at his deposition is permissible in the instant case.

### B. Weight Accorded to Adverse Inferences From Refusal to Answer

The Second Circuit has held that "the claim of privilege will not prevent an adverse finding or even summary judgment if the litigant does not present sufficient evidence

to satisfy the usual evidentiary burdens in the litigation." *See United States v. 4003–4005 5th Ave.*, 55 F.3d 78, 79 (2d Cir.1995). Moreover, as Justice Brandeis once noted, "[s]ilence is often evidence of the most persuasive character." *See United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 153–54, 44 S.Ct. 54, 56, 68 L.Ed. 221 (1923) *quoted with approval* in *Baxter*, 425 U.S. at 319, 96 S.Ct. at 1558.

In the instant case, as stated above, Robert's assertion of his Fifth Amendment privilege does not prevent this Court from drawing an adverse inference as to the ownership of Lion Crest and/or Devil His Due. The record shows that Robert indiscriminately used Lion Crest's resources, dominating its business activities while Edith served as its titular head. Thus, the Court accords considerable weight to the adverse inferences drawn from the fact that Robert refused to answer questions about his relationship with, financing of, and control over the purchase and management of Devil His Due.

### C. Nominee Theory

Having determined that adverse inferences should be drawn from Robert's refusal to answer questions, and that these inferences should be accorded considerable weight, the Court turns its attention to the ultimate issue, ownership of Lion Crest and Devil His Due. To show that Robert actually owned Lion Crest and Devil His Due, the IRS advances five theories: (A) nominee theory; (B) fraudulent conveyance theory; (C) alter ego theory; (D) lien on a going concern theory; and (E) constructive trust theory. The Court first addresses the nominee theory.

The Court has found no reported New Jersey cases addressing the factors relevant to nominee theory.[1] Thus, the Court applies factors used by other courts that have considered the nominee theory. *See Towe Antique Ford Found. v. IRS*, 791 F.Supp. 1450, 1454 (D.Mont.1992), *aff'd*, 999 F.2d 1387 (9th Cir.1993); *see also, Hill v. United States*, 844

---

1. The Court held in its previous consideration of this matter that New Jersey's substantive law applies. *See LiButti*, 894 F.Supp. at 597.

F.Supp. 263, 271 (W.D.N.C.1993) (citing *Towe Antique Ford Foundation* with approval).

■ In order to establish that property is held by a nominee the Court must consider six factors: (1) whether inadequate or no consideration was paid by the nominee; (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and the transferor; (4) whether they failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property. *Id.* In making these determinations, the Court relies on the record from the previous trial in addition to any adverse inference gleaned from Robert's deposition. *See LiButti*, 894 F.Supp. 589; *LiButti*, 107 F.3d at 121.

### i. Whether Inadequate or No Consideration Was Paid by the Nominee

■ In 1989 Robert deposited two checks totaling $185,000 into Lion Crest's bank account. That same year Lion Crest bought Devil His Due for $25,000. In 1990, the stable sold the horse for $45,000 then reacquired it in 1992–93 for $100,000 plus Lion Crest's interests in four other horses. The value of these interests is not specified, but the Court finds that they must have been considerable given that Devil His Due was worth approximately $3 million by January 1994.

At trial, Edith testified that a friend loaned her the $100,000 Lion Crest used to acquire Devil His Due in 1990, but she did not account for the funds Lion Crest initially used to buy Devil His Due or the interests in the four horses Lion Crest traded to reacquire it. When asked if Lion Crest used his money to finance Devil His Due's purchase or repurchase, Robert invoked his privilege against self-incrimination.

Because Edith did not prove her financial capacity to buy Devil His Due on either occasion, the Court looks to inferences from Robert's refusal to answer the following questions:

> Do you have any interest in Devil His Due?
>
> Do you own Devil His Due?
>
> Have you ever owned Devil His Due?
>
> Is it true that your money went to purchase Devil His Due the first time that he was purchased by Lion Crest Stables?
>
> Is it true that your money went to purchase Devil His Due the second time it was purchased by Lion Crest Stable?

Based on Robert's refusal to answer these questions, and Edith's inability to account for Lion Crest funds, the Court infers that Robert provided the means to purchase Devil His Due both in 1989 and 1992–93. Accordingly, the Court finds that Edith paid either inadequate or no compensation for Devil His Due on these occasions.

### ii. Whether the Property Was Placed in the Nominee's Name in Anticipation of a Lawsuit or Other Liability While the Transferor Remains in Control of the Property

Robert was convicted of filing fraudulent and false tax returns in 1977. As such, Robert has had a clear interest in secreting his assets to avoid paying a nearly $4.4 million tax liability. Edith knew that Robert had significant tax liabilities, that he was under constant investigation, and that he could not hold property in his own name. When Robert was asked if Edith knew of his tax liabilities since 1986, Robert declined to answer.

Adverse inferences from Robert's refusal to testify further support the IRS's contention that Robert controlled Devil His Due. As discussed previously, Robert's invocation of his Fifth Amendment privilege indicates to the Court that he ran Lion Crest and made all substantive decisions affecting Devil His Due. Thus, the Court finds that Robert placed the funds used to purchase Devil His Due in Edith's name in order to avoid his tax liabilities. Additionally, the Court finds that Robert had control of the horse at all relevant times.

### iii. Whether There is a Close Relationship Between the Nominee and the Transferor

The Court found that Robert and Edith had a close relationship when it first considered this matter. *See LiButti*, 894 F.Supp. 589. Therefore, the Court will not revisit this issue.

### iv. Whether the Nominee and Transferor Failed to Record the Conveyance

Edith credited Robert's two checks totaling $185,000 against an $800,000 loan balance he purportedly owed her, not to the purchase of Devil His Due. As such, Edith and Robert did not record the conveyance.

### v. Whether the Transferor Retains Possession

Edith's claim that she owned Devil His Due is made dubious by the testimony of several witnesses who testified that Robert made all substantive decisions affecting the horse and the stable's operations. In addition, the Court looks again to the inferences that can be drawn from Robert's refusal to answer the following questions:

Do you have any interest in Devil His Due?

Do you own Devil His Due?

Have you ever owned Devil His Due?

Is it true that you've controlled all of Lion Crest business since at least 1980?

Is it true that you've made all the management decisions for Devil His Due?

Based on these questions, the Court infers from Robert's silence that he owned, controlled and managed Lion Crest and Devil His Due. Accordingly, the Court finds that Robert did in fact retain possession of Devil His Due.

### vi. Whether the Transferor Continues to Enjoy the Benefits of the Transferred Property

Among the benefits of owning a racehorse is the right to train and sell it. Here, witnesses' testimony and adverse inferences taken from Robert's refusal to answer questions shows that he had substantial (if not complete) input on both of these matters. Moreover, the evidence established at trial shows that the monies accrued by Lion Crest inured to Robert's benefit. Robert indiscriminately used Lion Crest's accounts as his own and the stable paid for his substantial legal and lifestyle expenses (*e.g.* leased Mercedes, hundred thousand dollar credit card bill, several hundred thousand dollar home). Thus, given Robert's control over Devil His Due and the use of this and other Lion Crest assets to support him, the Court concludes that Robert continued to enjoy the benefits of Devil His Due.

Because the IRS has satisfied necessary elements of its nominee theory, the Court finds that Edith was the nominal owner of Devil His Due for Robert, the horse's effective owner. Thus, Robert's tax liens may appropriately be attached to Devil His Due and its derivative interests.[2]

### D. Remaining Theories of Ownership

The Court has found that the IRS proved Robert was the effective owner of Lion Crest and Devil His Due and that Edith was his nominee. Therefore, the Court need not discuss theories of fraudulent conveyance, alter ego, lien on a going concern, and constructive trust.

## IV. CONCLUSION

For the foregoing reasons, the Court enters **JUDGMENT FOR DEFENDANT**.

**IT IS SO ORDERED.**

---

**2.** Pending before the Court is the government's Renewed Emergency Order to Show Cause seeking, *inter alia*, an accounting of all funds generated by Devil His Due from August 3, 1995. The Court expresses no opinion as to the propriety of the relief sought by the government in that motion at this time.