**Edith LiBUTTI, doing business as Lion Crest Stable, a sole proprietorship, Plaintiff–Appellant–Cross–Appellee,**

**Margaux Stallions, LLC, Intervenor–Cross–Appellee,**

v.

**UNITED STATES of America, Defendant–Appellee–Cross–Appellant.**

Nos. 98–6003, 98–6023.

United States Court of Appeals, Second Circuit.

Argued Oct. 2, 1998.

Decided May 28, 1999.

**116**

Frank T. Becker, Lexington, Kentucky (Michael D. Meuser, Miller, Griffin & Marks, PSC, Lexington, Kentucky; Paul T. Sheppard, Hinman, Howard & Kattell, Binghamton, New York, of counsel), for Plaintiff–Appellant–Cross–Appellee.

Kenneth W. Rosenberg, Washington, D.C. (Thomas J. Maroney, United States Attorney, Northern District of New York, Syracuse, New York; Loretta C. Argrett, Assistant Attorney General, William S. Estabrook, Tax Division, Department of Justice, Washington, D.C., of counsel), for Defendant–Appellee–Cross–Appellant.

Richard E. Vimont, Lexington, Kentucky (Bernard F. Lovely, Vimont & Wills PLLC, Lexington, Kentucky; George F. Carpinello, Barrett Gravante Carpinello & Stern LLP, Albany, New York, of counsel), for Intervenor–Cross–Appellee.

Before: CARDAMONE, CALABRESI, and STRAUB, Circuit Judges

CARDAMONE, Circuit Judge:

The object of the present appeal—as in three previous federal court proceedings—is to decide who owns a prize thoroughbred racehorse named "Devil His Due." Plaintiff, Edith LiButti (Ms. LiButti, plaintiff, or appellant), claims that she is the owner, and the Internal Revenue Service (IRS) insists that her father, Robert LiButti, is the owner and that the plaintiff is merely his nominee. If the horse is shown to be the property of the father, the IRS would be in a position to levy upon it to satisfy over $4 million in unpaid income taxes owed by him.

One of the matters weighing heavily against appellant is the adverse inference drawn from her father's refusal to testify and answer questions on the horse's ownership at the 1995 trial. Two years later, in an apparent change of heart, he filed an affidavit saying that now he would testify. His neglect to act promptly illustrates the truth of the apt, in this case, insight—it is too late to close the barn door after the horse has bolted.

Ms. LiButti appeals from an amended judgment entered July 31, 1997 in the United States District Court for the Northern District of New York following a bench trial before Chief Judge Thomas J. McAvoy. The district court found in favor of the defendant United States (defendant, IRS, or the government), granting the IRS the right to levy on plaintiff's property interest in the horse. Plaintiff also appeals from an order entered December 2, 1997 denying her motion for a new trial. The United States cross-appeals from an August 6, 1997 order that granted only a portion of the restitution the government sought, and from the December 1997 order insofar as it denied the government's motion to amend the order of restitution. This order also denied the government's request for court-ordered restitution from Margaux Stallions (Margaux), which appears in these proceedings as an intervenor-cross-appellee, based upon the district court's conclusion that it lacked personal jurisdiction over Margaux.

BACKGROUND

Because this is the fourth time this case has been written on in federal court, the background will be brief. Unable to locate any assets in Robert LiButti's name, the IRS issued a levy against "Devil His Due," declaring that the delinquent taxpayer was its owner and that he had put ownership in the name of Lion Crest Stable, a business

owned by his daughter, Edith. Ms. LiButti brought a wrongful levy action against the IRS pursuant to 26 U.S.C. § 7426 seeking a permanent injunction barring the IRS from enforcing its levy against "Devil His Due." *See LiButti v. United States*, 894 F.Supp. 589, 590–91 (N.D.N.Y. 1995) (*LiButti I* ).

After a bench trial, the district court ruled in August 1995 that Ms. LiButti was the sole owner of the horse at the time it was levied upon because the government had failed to prove any transfer of ownership from the father to the daughter. *See id.* at 598–99. The trial court refused to draw any adverse inference against Ms. LiButti's claim of ownership arising from the fact that when her father was questioned about the racehorse's ownership he invoked his Fifth Amendment privilege and refused to answer any questions. *See id.* at 597.

The government appealed this adverse decision in October 1995. While that appeal was pending, Ms. LiButti entered into a syndicate agreement under which the ownership of "Devil His Due" was divided into 50 equal shares, 25 of which were sold to Margaux Stallions, LLC, a Kentucky limited liability company, for $1,224,000. Margaux later sold 12 of its 25 shares to third parties scattered in various states throughout the country.

On appeal from the August 1995 judgment in *LiButti I*, we vacated the district court's order and remanded the case because we did not believe, as the district court had, that the government was required to prove a money trail from Robert LiButti to "Devil His Due." *See LiButti v. United States*, 107 F.3d 110, 119–20 (2d Cir.1997) (*LiButti II* ). Instead, we stated that it would be sufficient for the government to show Robert LiButti effectively owned Lion Crest Stable and controlled its finances. We also considered the factors relevant to the admissibility of a non-party's invocation of the Fifth Amendment privilege in the course of civil litigation and ruled, as a matter of law, that an adverse inference could be drawn against Ms. LiButti based on her father's invocation of the Fifth Amendment. *See id.* at 123–24.

On July 2, 1997, with the case before it on remand, the district court held that Ms. LiButti held title to "Devil His Due" only as her father's nominee. Thus, the trial court lifted the injunction it had previously imposed against the enforcement of the IRS levy upon the horse. *See LiButti v. United States*, 968 F.Supp. 71, 77 (N.D.N.Y.1997) (*LiButti III* ). In reaching this conclusion, Chief Judge McAvoy considered evidence that shortly before purchasing the horse, Edith LiButti—in her certification for increased support from her ex-husband—had sworn that she and Lion Crest Stable were without funds. After her father deposited $185,000 into Lion Crest's bank account, as a partial repayment of a debt he allegedly owed the stable, Lion Crest had sufficient funds to purchase the horse. The New York State Racing and Wagering Board denied her a license because she did not know the source of the funds she used to start her stable's business. Nor did she know the purpose or use of millions of dollars of loans signed in her name. A bank employee testified that she signed Ms. LiButti's name to checks and bills of sale at her father's direction.

With respect to Robert LiButti's involvement with Lion Crest Stable, the record reveals that it carried over $1 million in loans for him from 1984–92. The father was actively involved in the sale and management of the stable's horses, and expended Lion Crest funds for his personal use, including the leasing of two automobiles, one a 1995 Mercedes, and the payment of his cellular phone and American Express bills, which for the three years from 1991 to 1994 totaled $192,558.25. Further, the rent of the home where Robert LiButti and his wife, Joan, resided was paid by Lion Crest Stable, as were subsequent real estate taxes and payments after the house was purchased by them. On top

of all this proof, the trial court also considered, as a factor on the issue of ownership of the horse, the adverse inference it drew from the father's invocation of the Fifth Amendment in response to questions directly bearing on that issue.

Following the July 2, 1997 issuance of the judgment in *LiButti III,* Ms. LiButti moved for a new trial and an amendment of the judgment pursuant to Federal Rule of Civil Procedure 59. Attached to the motion was her father's affidavit stating that he was now willing to testify. The motion requested that the court entertain Robert LiButti's testimony and draw new findings of fact and conclusions of law. In December 1997 the district court denied plaintiff's motion, ruling that a new trial was not warranted because there was no showing that such testimony would change the outcome of the case.

Meanwhile, the government had sought to obtain a court order compelling Ms. LiButti to make restitution by payment to it of the full value of "Devil His Due," and to account to it for all the income she had received on the horse's earnings since August 3, 1995, the date of the district court's original decision in *LiButti I.* But, the trial court was of the view, expressed in an August 1997 ruling, that the government was only entitled to restitution of monies derived from the racehorse after July 2, 1997, the date it had held that Ms. LiButti was her father's nominee. It would be inequitable, the court continued, to grant restitution for the nearly two-year period between August 3, 1995 and July 2, 1997 because in that interim, pursuant to the court's previous judgment, appellant had entered into the syndicate agreement with Margaux. Further, Chief Judge McAvoy noted that the government had neglected to file for a stay pending appeal to prevent the transfer of the horse as part of that agreement.

In the same August 1997 ruling the court said it could not pass on the government's claim for restitution against Margaux because it had no jurisdiction over that entity. It is from portions of these rulings embodied in the July 2, August 6, and December 2, 1997 orders that Edith LiButti appeals and the government cross-appeals.

## DISCUSSION

This appeal presents four issues for resolution: (1) the denial of Edith LiButti's request for a new trial on the grounds of new proof; (2) the adverse inference drawn against her claim by her father's refusal to answer questions about ownership of "Devil His Due" by his invocation of his Fifth Amendment privilege; (3) the government's cross-appeal seeking to broaden the order of restitution; and (4) its cross-appeal from the ruling that there was no jurisdiction over Margaux. We discuss these issues in order.

### I New Trial

We reverse a trial court's denial of a motion for a new trial only for an abuse of discretion. *See Ball v. Interoceanica Corp.,* 71 F.3d 73, 76 (2d Cir.1995) (per curiam). According to Rule 59(a)(2) of the Federal Rules of Civil Procedure, a new trial may be granted "in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States." Fed.R.Civ.P. 59(a)(2). Rule 61 sets out a workable test for when to grant a new trial, counseling that no error is ground for granting a new trial "unless refusal to take such action appears to the court inconsistent with substantial justice." Fed.R.Civ.P. 61. That is to say, a trial court should be most reluctant to set aside that which it has previously decided unless convinced that it was based on a mistake of fact or clear error of law, or that refusal to revisit the earlier decision would work a manifest injustice. *See Arizona v. California,* 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983). Certainly, a trial court should not grant a new trial simply because, like the proverbial second bite at the apple, the losing party

believes it can present a better case if afforded another chance. Nonetheless, in certain circumstances newly discovered evidence constitutes a recognized ground for a new trial. *See* 11 Charles Alan Wright Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* §§ 2805, 2808 (2d ed.1995).

Ms. LiButti avers that the district court abused its discretion when it denied her motion for a new trial, maintaining that such a trial is warranted in light of newly discovered evidence, that is, Robert LiButti's current willingness to testify. *Cf. United States v. Montilla–Rivera*, 115 F.3d 1060, 1065–67 (1st Cir.1997) (exculpatory affidavits from codefendants who did not testify at trial because they exercised their Fifth Amendment privileges were "newly discovered evidence" for purposes of new trial motion).

■ Even assuming that plaintiff's father's willingness to testify in her behalf would qualify as newly discovered evidence, plaintiff must also demonstrate a probability that the newly discovered evidence would change the outcome. *See Philip v. Mayer, Rothkopf Indus.*, 635 F.2d 1056, 1063 (2d Cir.1980); *Fisher Studio, Inc. v. Loew's Inc.*, 232 F.2d 199, 203 (2d Cir.1956). Here the motion for a new trial stated simply that Robert LiButti would testify, but it failed to specify what subjects his testimony would cover or how such proposed testimony would change the result the trial court had previously reached. The memorandum accompanying the motion stated, without elaboration, that "[w]e have every reason to believe that the testimony will show that Robert LiButti had no ownership interest in DEVIL HIS DUE." We agree with the district court's observation that this declaration, without more, made the proposed testimony of only speculative value.

■ Ms. LiButti next asserts she was entitled to a new trial or an amendment of the judgment because an intervening change in the law resulted from our ruling in *LiButti II*, which held that an adverse inference can be drawn from a non-party witness' refusal to testify. Courts will, of course, reconsider a decided case not only on account of newly discovered evidence and to correct a clear error or prevent manifest injustice—which grounds we have just commented upon—but also on account of an intervening change in controlling law. *See* 2A Lawyer's Cooperative Publishing, *Federal Procedure* § 3:705, at 362 (L.Ed. 1994). Usually, an intervening change in controlling law is a basis for an amendment of the judgment, rather than a new trial. *See* 12 James Wm. Moore et al., *Moore's Federal Practice* § 59.30[5][a][ii] (3d ed.1998).

Regardless, any change in the law wrought by us in *LiButti II* occurred before the district court handed down its opinion on the nominee issue, which we had remanded to it for decision. Hence, the trial court had the "new law" before it when it found that the daughter was her father's nominee. Appellant could have moved, but did not, to supplement the record with her father's testimony before the trial court's decision on remand. A new trial should not therefore be granted simply because the losing party thinks it may do better given another opportunity. We thus see no abuse of the trial court's discretion in its denial of plaintiff's motion for a new trial.

II Adverse Inference from Robert LiButti's Refusal to Testify

A. *Admissibility of the Adverse Inference*

On remand, the district court analyzed in *LiButti III*, 968 F.Supp. at 74–75, whether an adverse inference was admissible in this case using a four-factor test set out by us on the first appeal, *see LiButti II*, 107 F.3d at 123–24. Plaintiff argues that the trial court erred in its admissibility analysis.

In *LiButti II*, we stated that "[c]learly, the circumstances of this case compel the

admissibility and consideration by the trial court of [Robert LiButti's] refusals to answer the questions addressed to him . . . ." *Id.* at 124. We further said, "[s]ince we have ruled on the issue of admissibility, the district court should now evaluate the relevance of [Robert LiButti's] refusals and their probative value under Fed. R.Evid. 403, and the weight they should be accorded in the context of all of the other evidence." *Id.* Because the question of the admissibility of an adverse inference was decided by us on the prior appeal, no further discussion of admissibility is necessary.

### B. *Weight of the Adverse Inference*

■ Plaintiff contends that the district court weighted the adverse inference too heavily when it determined that Edith LiButti was her father's nominee because the court relied solely upon the inference without having before it other supporting evidence. An adverse inference may be given significant weight because silence when one would be expected to speak is a powerful persuader. *See United States ex rel. Bilokumsky v. Tod,* 263 U.S. 149, 153–54, 44 S.Ct. 54, 68 L.Ed. 221 (1923). But beyond that, the district court did not rely solely upon the adverse inference to conclude that Ms. LiButti was Robert LiButti's nominee. As directed by us on the previous appeal, *see LiButti II,* 107 F.3d at 124, the trial court tested the persuasiveness of the adverse inference against other evidence, and having done so, accorded considerable weight to the adverse inference because the record shows that the father made indiscriminate use of Lion Crest's resources and dominated its business dealings, while his daughter appeared merely as its nominal head, *see LiButti III,* 968 F.Supp. at 75.

We had already observed in *LiButti II* that compelling evidence exists to support drawing an adverse inference inimical to plaintiff's claim of entitlement to "Devil His Due." 107 F.3d at 125. Specifically, much evidence supports the conclusion that the daughter was her father's nominee. The district court made findings that the daughter served as her father's financial conduit, and that he effectively controlled Lion Crest as shown by the facts that:

(1) Edith asserted that she and Lion Crest were destitute shortly before Devil His Due was purchased; (2) Edith did not know the source of the funds she used to start Lion Crest; (3) Edith did not know the purpose/use of millions of dollars of loans signed in her name; and (4) Edith did not know so much as whether the business was incorporated or not. Moreover, the IRS showed: (1) Lion Crest carried $1,013,572.64 in loans for Robert from 1984–92; (2) Robert was actively involved in the sale and management of the stable's horses; and (3) Robert expended Lion Crest funds for his personal use.

*LiButti III,* 968 F.Supp. at 73. The ruling that Edith LiButti was Robert LiButti's nominee cannot therefore be said to rest solely upon the adverse inference. As a consequence, the trial court did not abuse its discretion in assessing the weight it accorded that inference.

### III   Restitution

■ We turn now to restitution. Generally, "a party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby." *Arkadelphia Milling Co. v. St. Louis S.W. Ry. Co.,* 249 U.S. 134, 145, 39 S.Ct. 237, 63 L.Ed. 517 (1919). But this rule is not without exceptions. "Restitution is not of mere right. It is *ex gratia,* resting in the exercise of a sound discretion; and the court will not order it where the justice of the case does not call for it . . . ." *Atlantic Coast Line R.R. Co. v. Florida,* 295 U.S. 301, 310, 55 S.Ct. 713, 79 L.Ed. 1451 (1935); *accord Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* 485 F.2d 786, 825 (D.C.Cir.1973); Restate-

ment of Restitution § 142 cmt. a, at 568 (1937) ("restitution is granted only where it is equitable so to do").

■ Hence, "the simple but comprehensive question is whether the circumstances are such that equitably the defendant should restore to the plaintiff what he has received." *Atlantic Coast*, 295 U.S. at 310, 55 S.Ct. 713. The essence of equity jurisdiction has been its flexibility to tailor each decree to the necessities of the specific case. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Because whether a party is entitled to the equitable remedy of restitution is a discretionary matter for a trial court, we review its ruling under an abuse of discretion standard. *See Cathedral of the Incarnation v. Garden City Co. (In re Cathedral of the Incarnation*), 90 F.3d 28, 35 (2d Cir. 1996); *United States v. Bedford Assocs.*, 713 F.2d 895, 902 (2d Cir.1983).

The government asserts the district court erred in holding that it could not recover proceeds derived from "Devil His Due" between the August 3, 1995 order and the July 2, 1997 order. On August 3, 1995 the district court held that Edith LiButti was not her father's nominee, and thus permanently enjoined the IRS from enforcing the levy it had placed on "Devil His Due." *See LiButti I*, 894 F.Supp. at 598–99. After appeal and on remand the same court ruled that because Edith LiButti is her father's nominee, Robert LiButti is the owner of "Devil His Due." *See LiButti III*, 968 F.Supp. at 77. Accordingly, in a July 2, 1997 order the permanent injunction prohibiting the IRS levy was lifted. During the intervening period, Edith LiButti received substantial proceeds through the syndication and sale of shares of the racehorse, as well as money from stud fees.

■ After weighing the equities, the district court decided that restitution prior to the July 2, 1997 order would be inappropriate. It reasoned that plaintiff was not unjustly enriched because she obtained the benefits pursuant to a valid judgment, and that the government had neglected to move for a stay pending appeal. It has been long-established law that simply filing an appeal from the grant or denial of an injunction—absent a stay of further proceedings—does not enjoin the operative effect of the trial court's ruling from which the appeal is taken. *See Hovey v. McDonald*, 109 U.S. 150, 161, 3 S.Ct. 136, 27 L.Ed. 888 (1883) ("[A]n appeal from a decree granting, refusing, or dissolving an injunction does not disturb its operative effect."); *see also Brill v. General Indus. Enters.*, 234 F.2d 465, 469–70 (3d Cir. 1956).

■ In the present case, it is clear that to protect itself from the possibility of appellant alienating money derived from "Devil His Due" as a result of the order enjoining the IRS levy, the government should have moved for an injunction pending appeal pursuant to Federal Rule of Civil Procedure 62(c), which states:

> When an appeal is taken from an interlocutory or final judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the rights of the adverse party.

Fed.R.Civ.P. 62(c).

■ However, a party's failure to seek a stay pending appeal does not preclude the possibility of it obtaining restitution. *See Fulton County Silk Mills v. Irving Trust Co. (In re Lilyknit Silk Underwear Co.)*, 73 F.2d 52, 53 (2d Cir.1934). Although a court deciding whether to award restitution may consider failure to seek a stay as one factor when weighing the equities, few courts have relied primarily on this factor in denying this equitable remedy. *See FilmTec Corp. v. Hydranautics*, 67 F.3d 931, 940 (Fed.Cir.1995); *cf. Texaco P.R., Inc. v. Department of Consumer Affairs*, 60 F.3d 867, 881–82 (1st Cir.1995);

*Thompson v. Washington,* 551 F.2d 1316, 1321–22 (D.C.Cir.1977).

Moreover, many other equitable factors lie heavily in favor of the government. This case arises out of Robert LiButti's tax fraud and his longstanding failure to pay tax assessments of over $4 million dollars. *See LiButti II,* 107 F.3d at 113. The government has had to work arduously to collect on those assessments in the face of considerable resistance from him and his daughter. Indeed, the last time we heard an appeal in this case, the panel observed:

> The record is replete ... with evidence of Robert's use of his daughter and Lion Crest for secreting his assets and as the conduits for his horse dealings, and the use of Lion Crest to support the affluent lifestyle to which he had become unaccountably accustomed.

*Id.* at 114. "Devil His Due" represents yet another asset that Robert LiButti sought to secrete from the government. Given this pattern of evasion and the lengths that the government has been forced to go to in response, we think the district court abused its permitted discretion when it limited the government's long-awaited recovery to that fraction of "Devil His Due" that remained in Edith LiButti's not-so-innocent hands on July 2, 1997. Accordingly, we reverse on this issue, and hold that the government is entitled to the discussed restitution.

### IV Jurisdiction Over Margaux

#### A. *Personal or* In Rem

■ The government also sought restitution from Margaux, which the district court denied on the grounds that it lacked jurisdiction over that entity. *See LiButti v. United States,* No. 94–CV–1114, 1997 WL 570493, at *2–3 (N.D.N.Y. Aug. 4, 1997) (*LiButti IV*). We review a dismissal for lack of *in personam* or *in rem* jurisdiction *de novo. See Chaiken v. VV Publ'g Corp.,* 119 F.3d 1018, 1025 (2d Cir. 1997) (*in personam*); *Dluhos v. The Floating & Abandoned Vessel,* 162 F.3d 63, 68 (2d Cir.1998) (*in rem*).

The trial court ruled first that it lacked *in personam* jurisdiction over Margaux. The exercise of *in personam* jurisdiction comports with the Fourteenth Amendment's Due Process Clause only where "minimum contacts [exist] between the defendant and the forum State," *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 291, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), so as not to offend "traditional notions of fair play and substantial justice," *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

The central minimum contacts inquiry is whether " 'the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.' " *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (quoting *World–Wide Volkswagen Corp.,* 444 U.S. at 297, 100 S.Ct. 559). The *Burger King* Court continues, stating:

> In defining when it is that a potential defendant should "reasonably anticipate" out-of-state litigation, the Court frequently has drawn from the reasoning of *Hanson* [which states that] ... "[t]he application of [the minimum contacts] rule will vary with the quality and nature of the defendant's activity, *but it is essential in each case* that there be some act by which the defendant *purposefully avails* itself of the privilege of conducting activities within the forum State, thus *invoking the benefits and protections of its laws.*"

471 U.S. at 475, 105 S.Ct. 2174 (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)) (emphasis added).

■ In the case at hand, Margaux did not "purposefully avail" itself of the protections or benefits of New York law. Margaux is a Kentucky limited liability company. It entered into the syndicate agreement within Kentucky's borders. It never bought or sold syndicated shares for

the horse in New York. "Devil His Due" was physically present in Kentucky when Edith LiButti and Margaux entered into the agreement and when Margaux took possession of the horse in 1995. Further, the syndicate agreement contained a Kentucky choice-of-law provision. Thus, as the district court found, Margaux did not "purposefully avail" itself of the benefits or protections of New York law.

In addition to the concept of a defendant purposefully availing itself of the protections of the law of the forum State, the Supreme Court has also found minimum contacts to exist when the defendant "purposefully directed" the harmful effects of his activities at the forum State. *See Burger King,* 471 U.S. at 472, 105 S.Ct. 2174; *Calder v. Jones,* 465 U.S. 783, 787 & n. 6, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). For instance, in *Calder v. Jones,* the Court found minimum contacts where the defendants, journalists in Florida who wrote a libelous story about a California resident, engaged in "intentional, and allegedly tortious, actions ... expressly aimed at California," and thus the effects of those actions were purposefully directed at California. *Id.* at 789, 104 S.Ct. 1482; *see also Keeton v. Hustler Magazine,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) (using "purposefully directed" where defendants intentionally directed libelous statements at the forum State). Other cases using "purposefully directed" have indicated that a forum may assert personal jurisdiction over "corporation[s] that deliver[ ] ... products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State," *Burger King,* 471 U.S. at 472–73, 476, 105 S.Ct. 2174, or "engage[ ] in continuous and widespread solicitation of business within [the forum] State," *Quill Corp. v. North Dakota,* 504 U.S. 298, 308, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992).

It is difficult to analogize Margaux to the commercial defendants in *Burger King* and *Quill* or the defendants in *Calder* and *Keeton* who "purposefully directed" their activities at the forum State by intending to cause tortious injury to one of its residents. Margaux did not intend to inflict harm on or commercially effect a resident of New York. Rather, it had no role in New York, and thus cannot be equated with *Calder, Keeton, Burger King,* or *Quill.* As a consequence, the district court correctly held that it lacked *in personam* jurisdiction over Margaux.

The district court also ruled that it lacked *in rem* jurisdiction over Margaux. *See LiButti IV,* 1997 WL 570493, at *2–*3. In *Shaffer v. Heitner,* 433 U.S. 186, 207, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), the Supreme Court explained that to have *in rem* jurisdiction it is necessary, at the very least, to satisfy the minimum contacts standard set out in *International Shoe.* Since Margaux did not have minimum contacts, the district court did not have *in rem* jurisdiction either.

### B. *Alternate Jurisdiction Theories*

The IRS declares there is an alternate theory involving Rule 25(c) and Rule 71 of the Federal Rules of Civil Procedure that gives the federal court in New York jurisdiction over Margaux. Rule 25(c) provides:

> (c) Transfer of Interest. In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.

Fed.R.Civ.P. 25(c). In several cases involving the question of whether a person could be substituted or joined under Rule 25(c), various courts have held that when a person is found to be a successor in interest, the court gains personal jurisdiction over them simply as a consequence of their status as a successor in interest, without regard to whether they had any other minimum contacts with the state. *See, e.g., City of Richmond v. Madison Management Group, Inc.,* 918 F.2d 438, 454–55

(4th Cir.1990); *Explosives Corp. of Am. v. Garlam Enters. Corp.*, 817 F.2d 894, 906 (1st Cir.1987); *Minnesota Mining & Mfg. Co. v. Eco Chem, Inc.*, 757 F.2d 1256, 1263 (Fed.Cir.1985); *Select Creations, Inc. v. Paliafito Am., Inc.*, 852 F.Supp. 740, 765 (E.D.Wis.1994); *Moody v. Albemarle Paper Co.*, 50 F.R.D. 494, 497–98 (E.D.N.C. 1970).

Margaux maintains that this principle cannot apply in this case because the government failed to make a motion to substitute or join Margaux as a party under Rule 25(c), and failed to serve Margaux in the manner that Rule 25(c) requires. The government responds by noting that even where no motion under Rule 25(c) is filed, the judgment against the original party binds the successor in interest as though the successor had been joined or substituted. *See Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1581–82 (Fed.Cir. 1986). Because such a judgment would be binding, the government continues, Rule 71 applies and effectively asserts the same principle that successors in interest are subject to the personal jurisdiction of the court even without additional minimum contacts.

Rule 71 provides that "when obedience to an order may be lawfully enforced against a person who is not a party, that person is liable to the same process for enforcing obedience to the order as if a party." Fed.R.Civ.P. 71. Because a successor in interest would be bound by a judgment regardless of whether a motion was made under Rule 25(c), the government argues that obedience to this judgment could be "lawfully enforced" against Margaux. Thus, the government's argument concludes, Rule 71 applies, and Margaux would be "liable to the same process" for enforcing obedience to the judgment "as if a party."

Even assuming the government's argument is properly before us despite the lack of a motion under Rule 25(c), the argument still fails. In the cases the government cites, personal jurisdiction was established only where the non-resident was found to be a "successor in interest" to the obligations of the party. Successor liability is a question of State law, and here the district court determined that the law of New Jersey applied. *See LiButti I*, 894 F.Supp. at 597; *see also Travis v. Harris Corp.*, 565 F.2d 443, 446 (7th Cir.1977).

In *Ramirez v. Amsted Industries*, 86 N.J. 332, 431 A.2d 811, 815 (1981), the Supreme Court of New Jersey adopted the traditional standard to determine whether a non-party is a "successor in interest." It first acknowledged that under New Jersey law where one company transfers all its assets to another company the latter is not liable for the debts of the transferor, except where: (1) it agreed to assume them; (2) the two corporations merged; (3) the purchaser is simply a continuation of the seller; or (4) when there is fraud. *See id.* This rule and its exceptions as to successor liability apply "regardless of whether the predecessor or successor organization was a corporation or some other form of business organization." *Graham v. James*, 144 F.3d 229, 240 (2d Cir.1998). Hence, even though Lion Crest Stable is a sole proprietorship and Margaux Stallions is a limited liability company, this law applies.

In each of the cases cited by the government, the non-resident who was subjected to personal jurisdiction met one of these exceptions. *See Explosives Corp.*, 817 F.2d at 906–07 (parent corporation could be substituted as a party where the parent actually controlled the litigation on behalf of the subsidiary); *Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir.1985) (transfer was undertaken fraudulently to avoid liability); *Minnesota Mining*, 757 F.2d at 1265 (transfer was entered into fraudulently to escape liability); *Select Creations*, 852 F.Supp. at 765–66 (partnerships set up to escape liability); *cf. Moody*, 50 F.R.D. at 496–98 (non-party acted as the agent of the party, and thus as a representative of the party implicitly agreed to the obligations of the party). Even in cases that consider Rule 71 in-

stead of or in addition to Rule 25(c), the non-party satisfied one of these exceptions before personal jurisdiction over it was established.

Margaux does not fall into any of these exceptions, and therefore it is not a successor in interest or subject to successor liability. As a consequence, the district court lacked personal jurisdiction over Margaux. *See Williams v. Bowman Livestock Equip. Co.*, 927 F.2d 1128, 1132 (10th Cir.1991) (non-party not within one of the exceptions was not a successor in interest, and district court had no personal jurisdiction over it).

Because there is a lack of personal jurisdiction, we do not reach the merits of whether the government is entitled to restitution from Margaux.

## CONCLUSION

For the foregoing reasons, we reverse the district court's August 1997 and December 1997 rulings on restitution, and affirm on the remaining issues in its judgment and orders.