T.C. Memo. 2019-47

UNITED STATES TAX COURT

NORMAN HINERFELD, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4879-15L.                    Filed May 2, 2019.

R's Appeals Office (Appeals) rejected P's offer to settle his liability for trust fund recovery penalties because it did not reflect the value of his residence, L, title to which he had previously transferred to his wife, W.

<u>Held</u>: Upholding a determination by Appeals that lacks an adequate explanation does not violate the doctrine of <u>SEC v. Chenery Corp.</u>, 318 U.S. 80 (1943), when the failure of explanation relates to a legal issue rather than a matter committed to the agency's discretion.

<u>Held</u>, <u>further</u>, because (1) P failed to established that W paid adequate consideration for L, (2) the record demonstrates, or provides grounds for inferring, that P transferred L to W to protect it from his creditors, and (3) P failed to demonstrate any respect in which the transfer of L affected his use or enjoyment of the property, W can appropriately be treated as holding title to L as P's nominee; accordingly, R's settlement officer did not abuse her discretion in rejecting an offer-in-compromise that did not reflect L's value.

**[*2]**  <u>Richard S. Kestenbaum</u>, <u>Scott L. Kestenbaum</u>, and <u>Bernard S. Mark</u>, for petitioner.

<u>Michael J. De Matos</u>, for respondent.

MEMORANDUM OPINION

HALPERN, <u>Judge</u>:  This case is before us for review of a determination by the Internal Revenue Service (IRS) Appeals Office (Appeals) to sustain the filing of a notice of Federal tax lien (NFTL) concerning trust fund recovery penalties (TFRPs) assessed against petitioner under section 6672[1] in regard to unpaid employment taxes of Thermacon Industries, Inc. (Thermacon), for the quarters ended September 30 and December 31, 2002, March 31, September 30, and December 31, 2003, and March 31 and June 30, 2004 (quarters in issue).  Before his resignation in 2003, petitioner had been chairman of Thermacon.  We must decide whether Appeals abused its discretion in rejecting petitioner's offer to settle for $12,720 liabilities that exceeded $550,000 when respondent issued the NFTL and remained almost $300,000 at the time of trial.

---

[1]All section references are to the Internal Revenue Code of 1986, as amended and in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[*3]                                    Background

The Larchmont Residence

Since 1968, petitioner and his wife have resided in a house located in Larchmont, New York (Larchmont residence). In February 2003, petitioner executed a deed by which he transferred title to the Larchmont residence to Mrs. Hinerfeld. The deed states that petitioner made the transfer "in consideration of ten ($10.00) dollars paid by * * * [Mrs. Hinerfeld]". The parties stipulated the deed to be a quitclaim deed. After transferring the Larchmont residence to his wife, petitioner continued to pay at least some of the expenses of maintaining the property.

Mrs. Hinerfeld's Payments to Financial Institutions

Between March 2002 and November 2003, Mrs. Hinerfeld made payments to various financial institutions totaling $5 million. The dates and amounts of those payments are as follows:

| Date | Amount | Payee |
|---|---|---|
| 3/15/02 | $300,000 | Commerce Bank of PA NA |
| 11/20/02 | 750,000 | Fleet National Bank |
| 1/28/03 | 1,100,000 | LaSalle Business Credit, LLC |
| 1/28/03 | 400,000 | LaSalle Business Credit, LLC |
| 11/7/03 | 850,000 | LaSalle Business Credit, LLC |

[*4]  11/7/03            900,000          LaSalle Business Credit, LLC

      11/7/03            700,000          LaSalle National Bank

Assessment of Trust Fund Recovery Penalties, the Prior Levy Notice, and Hinerfeld I

Respondent assessed petitioner's TFRP liabilities for the quarters in issue between February and May 2006.  The following June, respondent notified petitioner of his intention to collect those liabilities by levy.[2]  In Hinerfeld v. Commissioner (Hinerfeld I), 139 T.C. 277 (2012), we considered a petition to review Appeals' determination to sustain the proposed levy.  Hinerfeld I presented two issues for our decision:  (1) whether Appeals and area counsel in the Small Business/Self-Employed Division of the Office Chief Counsel had engaged in prohibited ex parte communications during the collection due process (CDP) hearing concerning the 2006 levy notice and (2) whether Appeals had abused its discretion in rejecting petitioner's offer to settle his liabilities for $74,857.  We resolved both issues in respondent's favor.

---

[2]The 2006 levy notice covered all of the quarters in issue other than the quarter ended March 31, 2004.  See Hinerfeld v. Commissioner (Hinerfeld I), 139 T.C. 277, 277 (2012).

[*5] The NFTL; Petitioner's Initial CDP Hearing

In July 2013, respondent issued to petitioner an NFTL regarding amounts assessed under section 6672 for the quarters in issue.  In August 2013, petitioner requested a CDP hearing in regard to the NFTL.  That request referred to a pending offer petitioner had made to settle his TFRP liabilities but raised no other issues.  In particular, petitioner did not dispute his TFRP liabilities.

In April 2014, before petitioner's initial CDP hearing, Settlement Officer (SO) Marilyn Matthews reviewed the deed by which petitioner transferred title to the Larchmont residence to his wife.  The copy of the deed included in the record bears no evidence of having been recorded.

In October 2014, petitioner's attorney, Richard Kestenbaum, sent SO Matthews a copy of an affidavit petitioner had given in Hinerfeld I in which he stated:  "In exchange for the deed [to the Larchmont residence], my wife paid off my bank guarantees of $300,000.00 to Commerce Bank and $750,000.00 to Fleet Bank".  The following month, after the initial CDP hearing, Mr. Kestenbaum sent SO Matthews another letter that identified wholly different payments as the consideration.  After claiming that "Mrs. Hinerfeld paid substantial consideration for the deed transfer", Mr. Kestenbaum elaborated:  "[A]mong other payments, Mrs. Hinerfeld satisfied debts of her husband to LaSalle Bank in the amount of

[*6] $830,000.00 and $700,000.00 * * * and then paid approximately $1,000,000.00 to satisfy the mortgage on the subject premises."

Notice of Determination

In a notice of determination issued in January 2015, Appeals sustained the NFTL filing. The notice of determination acknowledged petitioner's $12,720 offer-in-compromise (OIC) but stated that Appeals could not consider an OIC as a collection alternative because the financial information petitioner provided indicated that he had sufficient assets to satisfy his liabilities. In particular, Appeals "determined that the taxpayer maintains a 50% interest in the primary residence and that his wife does not meet the requirements of a purchaser according to Internal Revenue Code 6323(h)(6)." Appeals interpreted the deed by which petitioner transferred the Larchmont residence to his wife as indicating that he made that transfer "for no consideration." The notice of determination further states that "[t]he deed was quitclaimed while * * * [Thermacon's employment taxes] were accruing".

Remand

After petitioner petitioned this Court for a review of Appeals' determination, respondent moved to remand the case to Appeals for reconsideration of petitioner's OIC. Respondent acknowledged that SO Matthews' analysis "regarding Mrs.

**[*7]** Hinerfeld's status as a 'purchaser' under I.R.C. § 6323(h)(6) was a mistake of law." Mrs. Hinerfeld's status as a purchaser would have been relevant to the question of whether her interest in the Larchmont residence was subject to any preexisting tax lien on the property. But respondent did not assess petitioner's TFRPs until after petitioner had transferred the Larchmont residence to his wife. Therefore, as respondent acknowledged in his motion to remand, "there was no lien at the time the Larchmont property was transferred." We thus granted respondent's motion.

Conflicting Explanations of Consideration

After our remand of the case, petitioner and his attorney continued to make conflicting claims about the consideration Mrs. Hinerfeld allegedly paid for the Larchmont residence. During a March 2016 meeting with Appeals, petitioner disavowed the claims his attorney had made in his November 2014 letter to SO Matthews. At that meeting, petitioner claimed that Mrs. Hinerfeld's payments to the LaSalle entities in November 2003 had nothing to do with the transfer of the Larchmont residence. Instead, petitioner claimed that Mrs. Hinerfeld had made a separate payment of $1 million on the date of the deed. In response, Appeals gave petitioner two weeks to provide documentation of the alleged $1 million payment.

**[*8]** Petitioner later admitted in a letter to SO Matthews that "[t]here was no 'million dollar check'." In the meantime, Mr. Kestenbaum sent SO Matthews a letter in which he reverted to his original claim. "In payment for the equity in the subject property," Mr. Kestenbaum alleged, "Mrs. Hinerfeld, on March 15, 2002, paid the sum of $300,000.00 to satisfy Mr. Hinerfeld's liability to Commerce Bank." "In addition," Mr. Kestenbaum added, "on November 20, 2002, in further payment for the equity in the residence, Mrs. Hinerfeld tendered a letter of credit to Fleet National Bank in the amount of $750,000.00 to satisfy Mr. Hinerfeld's obligation to Fleet." (Petitioner's subsequent letter to SO Matthews made the same claim.)

Supplemental Notice of Determination

In the supplemental notice of determination (supplemental notice) it issued to petitioner, Appeals stated that it could not consider an OIC as a collection alternative because he "has sufficient equity in assets to satisfy the liabilities". In reaching that conclusion, SO Matthews treated the Larchmont residence as an asset available to satisfy petitioner's liabilities on the ground that Mrs. Hinerfeld

**[*9]** held that property as petitioner's nominee. SO Matthews based her analysis on Internal Revenue Manual (IRM) pt. 5.17.2.5.7.2(3) (Jan. 8, 2016).[3]

The supplemental notice does not explain in any detail SO Matthews' application of the factors listed in the IRM. Instead, it states only: "Most or all of the factors listed in * * * Internal Revenue Manual section 5.17.2.5.7.2 that are used to determine if a nominee situation exists are present in this case."

---

[3]Internal Revenue Manual (IRM) pt. 5.17.2.5.7.2(3) (Jan. 8, 2016) stated:

No one factor determines whether a nominee situation is present, but a number of factors taken together may. The following list is neither exhaustive nor exclusive, but nominee situations typically involve one or more of the following:

(a.) The taxpayer previously owned the property.

(b.) The nominee paid little or no consideration for the property.

(c.) The taxpayer retains possession or control of the property.

(d.) The taxpayer continues to use and enjoy the property conveyed just as the taxpayer had before such conveyance.

(e.) The taxpayer pays all or most of the expenses of the property.

(f.) The conveyance was for tax avoidance purposes.

**[*10]** The supplemental notice states repeatedly that the transfer of title to the Larchmont residence occurred while Thermacon's employment taxes were accruing.

Trial Testimony

According to Mrs. Hinerfeld's testimony at trial, her agreement to pay petitioner's liabilities arose from his interest in placing a second mortgage on the house to pay those liabilities. Mrs. Hinerfeld expressed concern about losing the house and offered to give him the funds to repay the liabilities and thereby avoid further encumbering the residence. In exchange, she said, she asked that title to the house be transferred to her name to protect it from petitioner's creditors. Mrs. Hinerfeld acknowledged that the payments she claimed to have made as consideration for the house were made before execution of the deed. When asked why, she said, "Well, I had to wait for it but that was my quid pro quo. I get the house and I will pay your loans."

In his own testimony at trial, petitioner attributed the delay in execution of the deed to his attorney's busy schedule. Petitioner also testified that he was unaware of Thermacon's unpaid employment taxes until 2006, when he was apprised of Thermacon's liabilities by the corporation's then owner.

**[*11]**                                    Discussion

I.      Applicable Statutory Provisions

        Sections 6320 and 6330 provide a taxpayer the right to notice and the

opportunity for an Appeals hearing before the Commissioner can collect unpaid

tax by means of a lien or levy against the taxpayer's property.  If a taxpayer

requests a CDP hearing, the Appeals officer conducting the hearing must verify

that the requirements of any applicable law or administrative procedure have been

met.  Secs. 6320(c), 6330(c)(1).  The taxpayer may raise at the hearing any

relevant issue relating to the unpaid tax or the collection action, including

appropriate spousal defenses, challenges to the appropriateness of collection

actions, and offers of collection alternatives.  See sec. 6330(c)(2)(A).  Section

6330(d)(1) allows a taxpayer to "appeal * * * to the Tax Court" a determination

under section 6320 or 6330.

        Although petitioner claims to have resigned from Thermacon in 2003 and to

have been unaware of the corporation's unpaid employment taxes until 2006, he

does not dispute his liability under section 6672(a) for Thermacon's unpaid

[*12] employment taxes for the quarters in issue.[4]  Petitioner argues only that SO

Matthews abused her discretion in rejecting his OIC.

Section 7122(a) gives the Commissioner the discretion to compromise

unpaid tax liabilities.  Section 301.7122-1(b)(2), Proced. & Admin. Regs., lists

doubt as to collectibility as a valid ground for compromising an unpaid liability.

"Doubt as to collectibility exists in any case where the taxpayer's assets and

income are less than the full amount of the liability."  Id.  Generally, under the

Commissioner's administrative guidelines, Appeals will accept a taxpayer's OIC as

a result of doubt as to collectibility only if the OIC reflects the taxpayer's

reasonable collection potential (RCP)--that is, the amount the Commissioner could

reasonably collect through other means, including administrative and judicial

collection remedies.  See IRM pt. 5.8.4.3(2) (May 10, 2013).  A taxpayer's RCP

ordinarily includes, in addition to his own assets and future income, any amounts

collectible from third parties, such as through enforcement of a lien against

_____

[4]Sec. 6672(a) imposes a penalty equal to the amount of any unpaid
employment taxes withheld by a corporation from its employees' wages on any
person who willfully fails to collect, account for, or pay over those taxes.  In
general, any person with the duty and authority to cause the corporation to
withhold and pay over the taxes in question can be subject to liability under sec.
6672(a).  See sec. 6671(b).

**[\*13]** property held by a nominee of the taxpayer. IRM pt. 5.8.4.3.1(1) (Apr. 30, 2015).[5] We generally find no abuse of discretion when an Appeals officer rejects a taxpayer's OIC because it does not reflect the taxpayer's RCP, determined in accordance with the Commissioner's administrative guidance. E.g., Caney v. Commissioner, T.C. Memo. 2010-90, 2010 WL 1687679, at \*2.

II.     Standard and Scope of Review

        A.     Standard of Review:  Dalton

The parties devote considerable portions of their briefs to the questions of the standard and scope of our review. When a taxpayer's underlying liability is at issue in a CDP case, we review Appeals' determination de novo; otherwise, we review that determination for abuse of discretion. E.g., Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). The parties agree that, because petitioner does not challenge his underlying liabilities, our review is generally for abuse of discretion. Cf. 5 U.S.C. sec. 706(2)(A) (2018) (requiring a reviewing court subject to the judicial review provisions of the Administrative Procedure Act (APA) to "hold unlawful and set aside agency action, findings, and conclusions found to be \* \* \*

_____

[5]The value of property held on behalf of a taxpayer by a nominee can be included in the taxpayer's RCP regardless of whether the Commissioner proceeds against the property. See IRM pt. 5.8.5.6(7) (Sept. 30, 2013) ("It is not necessary to actually seek or obtain any specific legal remedy in order to address \* \* \* [transferee/nominee/alter ego] issues in an offer.").

**[\*14]** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). In Kendricks v. Commissioner, 124 T.C. 69, 75 (2005), however, we wrote: "When faced with questions of law * * * the standard of review makes no difference. Whether characterized as a review for abuse of discretion or as a consideration 'de novo' (of a question of law), we must reject erroneous views of the law." But Kendricks left open the question of the standard we apply in identifying error in a legal conclusion on which a determination by Appeals rests. Do we accept any legal conclusions that are reasonable, even if we might reach a different conclusion? Or do we instead resolve underlying legal issues by applying our own view of the law?

In Dalton v. Commissioner, 682 F.3d 149, 156 (1st Cir. 2012), rev'g 135 T.C. 393 (2010), and T.C. Memo. 2011-136, the Court of Appeals for the First Circuit described a court's role in CDP cases as "consider[ing] whether the factual and legal conclusions reached at a CDP hearing are reasonable, not whether they are correct." Respondent urges us to "follow the reasonableness standard set forth by the First Circuit in Dalton." Petitioner observes that, because he does not reside in the First Circuit, we need not follow the doctrine of Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971), and

**[\*15]** apply <u>Dalton</u>'s reasonableness standard.  Petitioner thus urges us instead to review SO Matthews' legal conclusion de novo.

This Court has not yet expressly adopted the reasonableness test articulated by the Court of Appeals in <u>Dalton</u>,[6] and the present case does not give us occasion to do so.  For the reasons described below, we conclude that SO Matthews' determination that Mrs. Hinerfeld held title to the Larchmont residence as petitioner's nominee was not only reasonable but correct.[7]

---

[6]Citing our opinions in <u>Porro v. Commissioner</u>, T.C. Memo. 2014-81, <u>aff'd</u>, 589 F. App'x 502 (11th Cir. 2015), and <u>Jewell v. Commissioner</u>, T.C. Memo. 2016-239, respondent claims that we have "applied the <u>Dalton</u> principles in cases outside of the First Circuit."  In <u>Porro</u>, we did uphold as reasonable an SO's determination regarding the ownership of property, but that issue proved to be irrelevant to our disposition of the case.  The taxpayers' RCP would have been more than twice the amount of their offer without regard to the property in issue.  Thus, we noted that, "even if we agreed with * * * [the taxpayers] and disregarded the value of the * * * [property], it would not affect the outcome of this case." <u>Porro v. Commissioner</u>, at \*17.  In <u>Jewell v. Commissioner</u>, at \*19, we cited <u>Dalton v. Commissioner</u>, 682 F.3d 149 (1st Cir. 2012), <u>rev'g</u> 135 T.C. 393 (2010), <u>and</u> T.C. Memo. 2011-156, principally for the proposition that, should the Commissioner enforce a lien against property held by a corporation that he claimed to be the taxpayer's nominee, the corporation "may have an opportunity to assert its ownership and to litigate that question in an appropriate forum."

[7]Because SO Matthews did not explain her rationale in any detail, we cannot be sure that our conclusion rests on the analysis she applied.  But the prospect that we might be relying on an analysis that differs from hers does not prevent us from upholding her determination.  <u>See</u> <u>infra</u> part III.C.

**[\*16]** B.  Scope of Review:  The Record Rule

Regarding the scope of our review, respondent argues that, because petitioner's underlying liabilities are not at issue, review "should be limited to the administrative record."  In Camp v. Pitts, 411 U.S. 138, 142 (1973), the Supreme Court opined:  "In applying * * * [the] standard [provided in 5 U.S.C. sec. 706(2)(A)], the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  In Robinette v. Commissioner, 123 T.C. 85, 95 (2004), rev'd, 439 F.3d 455 (8th Cir. 2006), however, we held that, "when reviewing for abuse of discretion under section 6330(d), we are not limited by the Administrative Procedure Act * * * and our review is not limited to the administrative record."  We noted that the statutory provisions governing our traditional deficiency jurisdiction predated the APA and that, accordingly, the APA's judicial review provisions did not apply to deficiency cases.  And the jurisdiction granted us by section 6330(d) to consider appeals in CDP cases, we reasoned, is "part and parcel" of the statutory framework granting us jurisdiction to redetermine deficiencies.  Id. at 97-98.

The Court of Appeals for the Eighth Circuit reversed our Opinion in Robinette and held that the record rule applies in CDP cases before this Court. The court declined to view CDP cases as part and parcel of our traditional, pre-

**[*17]** APA deficiency jurisdiction. "Collection due process hearings under § 6330", the court observed, "were newly-created administrative proceedings in 1998, and the statute provided for a corresponding new form of limited judicial review." Robinette v. Commissioner, 439 F.3d at 461. Two other Courts of Appeals have concluded that the record rule applies to CDP cases before this Court. See Keller v. Commissioner, 568 F.3d 710, 718 (9th Cir. 2009), aff'g in part T.C. Memo. 2006-166, and aff'g in part, rev'g in part decisions in related cases; Murphy v. Commissioner, 469 F.3d 27, 31 (1st Cir. 2006), aff'g 125 T.C. 301 (2005).

Although all three Courts of Appeals that have considered the issue have rejected our position that the record rule is inapplicable to CDP cases, we have not expressly overruled our Opinion in Robinette. Nonetheless, at least two of our more recent Opinions call into question our rationale in that case.

In Porter v. Commissioner, 130 T.C. 115, 120 (2008), the Commissioner argued that the Court of Appeals' reversal of our Opinion in Robinette required us to accept the record rule when reviewing the denial of innocent spouse relief. We had initially adopted our position regarding the inapplicability of the record rule in innocent spouse cases in Ewing v. Commissioner, 122 T.C. 32 (2004), vacated, 439 F.3d 1009 (9th Cir. 2006). In Ewing, we noted the similarity in the statutory

**[\*18]** text granting us jurisdiction in deficiency and innocent spouse cases.

Section 6213(a) gives us jurisdiction to "redetermin[e]" deficiencies. And section

6015(e)(1)(A) gives us jurisdiction to "determine" appropriate innocent spouse

relief. In Porter v. Commissioner, 130 T.C. at 118, we relied on that same

similarity in statutory text to conclude that "[s]ection 6015 is part and parcel of the

* * * statutory framework" governing our deficiency jurisdiction. We

distinguished Robinette on the ground that "Congress chose not to use the word

'determine' or some derivation thereof in section 6330(d)". Id. at 120. In doing so,

we implicitly acknowledged that, given the difference in statutory terms, section

6015 can more readily than section 6330(d) be viewed as part and parcel of the

statutory framework governing our traditional, pre-APA deficiency jurisdiction.

More recently, in Kasper v. Commissioner, 150 T.C. 8 (2018), we accepted

the applicability of the record rule in cases involving the Commissioner's denial of

whistleblower awards. Among other things, we noted that the jurisdictional

statute, section 7623(b)(4), does not allow us to determine (or redetermine) the

appropriate whistleblower award. It simply allows the Commissioner's

determination regarding a whistleblower award to be "appealed" to this Court. "If

Congress's use of 'determine' was as important as our caselaw tells us it was," we

reasoned, "then the use of 'appeal' in a jurisdictional grant is telling." Id. at 17. In

[*19] that regard, we acknowledged that the text of section 6330(d)(1), before its amendment in December 2015, was "admittedly similar to that in section 7623(b)". Id. at 19. Nonetheless, we allowed that Kasper v. Commissioner, 150 T.C. at 19 n.13, was "not the right case to revisit the record rule's application in CDP cases."

Nor is the case now before us. As with the issue regarding the standard of our review, we need not resolve the question of the scope of our review. Whether or not we limit our review to the administrative record, we would conclude that SO Matthews correctly took into account the value of the Larchmont residence in evaluating petitioner's OIC.

III. Other Preliminary Issues

A. Impact of Hinerfeld I

Before evaluating SO Matthews' determination regarding the nominee issue, we must address two aspects of Appeals' consideration of the present case that petitioner claims establish, by themselves, that rejection of his OIC was an abuse of discretion. First, petitioner alleges that, in Hinerfeld I, the Commissioner accepted that the transfer of the Larchmont residence had not been fraudulent. Petitioner claims that Appeals' alleged failure to "follow its own prior conclusions * * * alone is arbitrary and an abuse of discretion." Respondent counters that "SO Matthews * * * was under no obligation to reach the same conclusion as that of

**[\*20]** \* \* \* [the SO in the prior case] regarding the transfer of the Larchmont residence." We agree. If this Court had concluded in <u>Hinerfeld I</u> that petitioner retained no interest in the Larchmont residence after his transfer of legal title to his wife, petitioner might be able to argue that that conclusion was binding for purposes of the present case under collateral estoppel. But petitioner's counsel, Mr. Kestenbaum, conceded at trial that we did not address that issue in <u>Hinerfeld I</u> and that the doctrine of collateral estoppel is thus inapplicable.[8]

### B.  Form of Deed

Petitioner also argues that a mischaracterization, in the original notice of determination, of the deed by which petitioner transferred title to the Larchmont residence to his wife, evidenced a "mistake of law" that "standing alone, should constitute an abuse of discretion." Respondent accepts that SO Matthews' description of petitioner as having "quitclaimed" the Larchmont residence was in

---

[8]The SO handling the CDP hearing concerning the levy notice addressed in <u>Hinerfeld I</u>, 139 T.C. 277, concluded that acceptance of Mr. Hinerfeld's offer would be premature because then-pending litigation might have disclosed the availability of an additional source of collection. We concluded that, under those circumstances, Appeals had not abused its discretion in rejecting Mr. Hinerfeld's OIC. In evaluating Mr. Hinerfeld's offer, Appeals determined that his transfer of the Larchmont residence to his wife had not been fraudulent. When the Commissioner sought at trial and on brief to raise the fraudulent transfer issue, we declined to consider it because "[t]he transfer of the residence \* \* \* played no role in the determination to reject \* \* \* [Mr. Hinerfeld's] offer-in-compromise". <u>Id.</u> at 280 n.3.

[*21] error (notwithstanding the parties' stipulation describing the deed as a quitclaim deed) but contends that her error was "harmless" because it did not affect her determination that Mrs. Hinerfeld held the Larchmont property as petitioner's nominee. Again, we agree with respondent. As petitioner acknowledges, the distinction among the various types of deeds for conveying property under New York law relates to the "warranties or covenants made by the grantor"--a point that has no obvious relevance to the factors on which SO Matthews based her conclusion.

C.     Adequacy of Explanation of Appeals' Determination:  Chenery

Petitioner also complains that, "[a]lthough SO Matthews cited to the IRM and its provisions respecting nominee theories of ownership, the administrative record discloses no analysis or thoughtful consideration of any of the factors and fails to apply them in a reasoned way to Petitioner's case". Petitioner's argument implicates a fundamental doctrine of administrative law drawn from opinions of the Supreme Court in SEC v. Chenery Corp. (Chenery I), 318 U.S. 80 (1943), and SEC v. Chenery Corp. (Chenery II), 332 U.S. 194 (1947). As articulated by the Court in Chenery II, 332 U.S. at 196, the basic Chenery doctrine posits that "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of

[*22] such action solely by the grounds invoked by the agency." And that basic

doctrine has "an important corollary": "If the administrative action is to be tested

by the basis upon which it purports to rest, that basis must be set forth with such

clarity as to be understandable." Id.[9]

The Chenery doctrine rests on a proper respect for the separate roles of

administrative agencies and the courts who review their determinations. In

Chenery I, 318 U.S. at 88, the Court opined: "If an order is valid only as a

determination of policy or judgment which the agency alone is authorized to make

and which it has not made, a judicial judgment cannot be made to do service for an

administrative judgment. * * * [A]n appellate court cannot intrude upon the

domain which Congress has exclusively entrusted to an administrative agency."

The Court thus drew a clear distinction between acts of administrative discretion,

---

[9]As recently as 2011, this Court had not decided whether the Chenery doctrine applied to our CDP cases. See Rosenbloom v. Commissioner, T.C. Memo. 2011-140, 2011 WL 2490659, at *7 n.17 ("[W]e haven't yet addressed the applicability of Chenery in CDP cases, and we are not going to start in a case where neither party made the argument."). Since then, however, we have repeatedly accepted the doctrine's potential application. See Antioco v. Commissioner, T.C. Memo. 2013-35; Jones v. Commissioner, T.C. Memo. 2012-274, at *22-*23 (invoking Chenery to justify refusal to consider "post hoc explanations" for sustaining Appeals' determination); Salahuddin v. Commissioner, T.C. Memo. 2012-141, 2012 WL 1758628, at *7 ("[O]ur role under section 6330(d) is to review actions that the IRS took, not actions that it could have taken.").

**[*23]** in which courts should be reluctant to interfere, and legal determinations, which are more squarely within the courts' purview:

> If the action rests upon an administrative determination--an exercise of judgment in an area which Congress has entrusted to the agency-- of course it must not be set aside because the reviewing court might have made a different determination were it empowered to do so. But if the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law.

Chenery I, 318 U.S. at 94.

Although the supplemental notice provides only a conclusory explanation of SO Matthews' determination that Mrs. Hinerfeld held the Larchmont property as petitioner's nominee, we can nonetheless uphold that determination without violating the Chenery doctrine or its corollary adequate explanation requirement. The reason, simply put, is that the treatment of Mrs. Hinerfeld as her husband's nominee is a legal issue that is not committed to respondent's administrative discretion. SO Matthews' failure to explain her reasoning means that, even if we were to reach the same conclusion she did, we could not be confident that we would be relying on the same analysis. But our upholding her determination on grounds that might differ from the precise analysis she employed would not encroach upon the Commissioner's discretion.

[*24] The issue of the adequacy of a taxpayer's proposed OIC is obviously one committed to the Commissioner's administrative discretion. Therefore, we cannot uphold the rejection of an OIC on grounds other than those on which the agency relied. It is not for us to say which proposals are acceptable and which are not. But the agency has already told us that, in the exercise of its discretion, it would not accept petitioner's OIC if he can be treated as owning the Larchmont residence. And the question of petitioner's rights in that property is a legal one. The adequacy of an offer of $x in settlement of a liability of $y made by a taxpayer with assets of $z is a question for the agency to determine. But whether the assets available to satisfy the taxpayer's liability are $z or some lesser amount may turn on "determination[s] of law as to which * * * [our] reviewing authority * * * come[s] into play". See Chenery I, 318 U.S. at 94.[10]

_____

[10]If the reasonableness test of Dalton v. Commissioner, 682 F.3d at 156, defined the standard of our review, the question of Mrs. Hinerfeld's status as petitioner's nominee might not be a legal question. As the Court of Appeals for the First Circuit recognized in Dalton, Appeals' rejection of a taxpayer's OIC because it does not take into account property held by a third party who may be the taxpayer's nominee does not definitively resolve the legal issue of the property's ownership. That question would be resolved only if and when the Commissioner proceeds against the property, at which time the alleged nominee would have the opportunity to contest the Commissioner's claim. When Appeals rejects a taxpayer's OIC because it fails to take into account property held by an alleged nominee, it merely concludes that the taxpayer is sufficiently likely to have an interest in the property to warrant its inclusion in the taxpayer's RCP. And that

(continued...)

**[*25]** Although SO Matthews' failure to articulate her reasoning does not risk our encroaching on the Commissioner's discretion in violation of the <u>Chenery</u> doctrine, that failure could still be grounds for remand if it prevented effective judicial review. The requirement of clear explanations of agency actions is, at least to some extent, independent of <u>Chenery</u>. Judge Friendly argued that it would "misconstrue[]" the adequate explanation requirement to treat it as "included within the '<u>Chenery</u> doctrine'". Henry J. Friendly, "<u>Chenery</u> Revisited: Reflections on Reversal and Remand of Administrative Orders," 1969 Duke L.J. 199, 206. To satisfy that part of the adequate explanation requirement that is independent of <u>Chenery</u>, however, an explanation need not be "a paragon of clarity". <u>See</u> <u>Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc.</u>, 419 U.S. 281, 290 (1974). It need only be sufficient to allow for "effective judicial review". <u>Camp</u>, 411 U.S. at 142-143.

---

[10](...continued)

question--how likely a taxpayer's potential interest in property must be for it to be included in the taxpayer's RCP--may well be one committed to the Commissioner's discretion. Even so, we need not determine the applicability of <u>Dalton</u>'s reasonableness test in deciding whether to uphold Appeals' determination in the present case or instead remand the case for further proceedings. Because we would conclude on the record before us (whether or not limited to the administrative record) that, as a matter of law, Mrs. Hinerfeld held the Larchmont residence as petitioner's nominee, petitioner's interest in that property would appropriately be taken into account in determining his RCP under any standard of assessing potential ownership.

**[\*26]** SO Matthews' explanation of her rejection of petitioner's OIC, though conclusory, is nonetheless adequate for us to conduct judicial review. We can assess her conclusion that Mrs. Hinerfeld holds the Larchmont residence as petitioner's nominee without knowing the precise analysis that led her to that conclusion.

Although the APA requires an agency that denies the request of an interested person made in connection with an agency proceeding to provide "[p]rompt notice" of that denial that includes "a brief statement of the grounds for denial", 5 U.S.C. sec. 555(e) (2018), that requirement has been construed as simply a codification of the more general requirement of adequate explanation for agency actions originating in caselaw, see Tourus Records, Inc. v. DEA, 259 F.3d 731, 737 (D.C. Cir. 2001) (describing 5 U.S.C. sec. 555(e) as a codification of the "'fundamental' requirement of administrative law" that "an agency 'set forth its reasons' for decision"). Thus, the 5 U.S.C. sec. 555(e) requirement of a brief explanatory statement is no more stringent than the general adequate explanation requirement. A statement complies with 5 U.S.C. sec. 555(e) if it is "sufficiently detailed * * * [to allow a] reviewing tribunal * * * [to] appraise the agency's determination under the appropriate standards of review." City of Gillette, Wyo. v. FERC, 737 F.2d 883, 886 (10th Cir. 1984). Because SO Matthews' explanation

**[\*27]** of her rejection of petitioner's proposed OIC would comply with 5 U.S.C. sec. 555(e) as well as the more general judicially created administrative law requirement, the adequacy of her explanation does not give us any more reason than the question of the scope of our review to reconsider the APA's applicability to our CDP cases.

IV.  Mrs. Hinerfeld as Petitioner's Nominee

Having disposed of petitioner's threshold arguments and considered the standard and scope of our review, we now turn to the ultimate issue the case presents:  whether SO Matthews was correct in treating Mrs. Hinerfeld as holding title to the Larchmont residence as petitioner's nominee.

A.  Relevant Factors Under New York Law

We begin by asking whether New York courts would recognize the nominee theory on which SO Matthews relied.  Although Federal law provides means by which the Commissioner can proceed against property owned by a delinquent taxpayer, the question of whether a taxpayer has an interest in particular property must be answered by State law.  See, e.g., United States v. Nat'l Bank of Commerce, 472 U.S. 713, 722 (1985).  And it is a "universal" conflicts of laws principle that "the law of the place where it is situated * * * governs all matters

**[\*28]** concerning the title and disposition of real property". 16 Am. Jur. 2d, Conflict of Laws, sec. 22 (2009).

The District Court for the Southern District of New York acknowledged in Nassar Family Irrevocable Tr. v. United States, No. 13 Civ. 5680 (ER), 2016 WL 5793737, at \*8 (S.D.N.Y. Sept. 30, 2016), aff'd sub nom. United States v. Nassar, 699 F. App'x 46 (2d Cir. 2017), that "New York state courts have not explicitly applied the nominee theory of ownership in tax cases." As that court went on to note, however, it and other District Courts in the Second Circuit "have applied the nominee theory in tax cases where the property interest was governed by New York law." Id.; see also United States v. Evseroff, No. 00-cv-06029 (KAM), 2012 WL 1514860, at \*9-\*13 (E.D.N.Y. Apr. 30, 2012), aff'd, 528 F. App'x 75 (2d Cir. 2013); Giardino v. United States, No. 96-cv-6348T, 1997 WL 1038197, at \*2-\*5 (W.D.N.Y. Oct. 29, 1997); Blue Lotus Holdings Ltd., Inc. v. United States, No. 96-cv-233, 1996 WL 679758, at \*3-\*4 (N.D.N.Y. Oct. 22, 1996); First Corp. Sedans, Inc. v. United States, No. 94 Civ. 7642 (DC), 1996 WL 145958, at \*4 (S.D.N.Y. Apr. 1, 1996). In determining whether a titleholder is really a nominee for a delinquent taxpayer, the court in each cited case applied a six-factor test drawn from LiButti v. United States, 894 F. Supp. 589 (N.D.N.Y. 1995), vacated and remanded, 107 F.3d 110 (2d Cir. 1997).

**[*29]** <u>LiButti</u> was a wrongful levy suit brought by Edith LiButti to challenge the Government's efforts to collect tax owed by her father, Robert, by levying on a racehorse, Devil His Due, which it claimed she held as his nominee. Although Edith and her father were New Jersey residents, Edith brought suit in the District Court for the Northern District of New York because the IRS had seized Devil His Due when the horse was in Saratoga to run in the Whitney Handicap. Because the court determined that New Jersey had a stronger interest in the case than did New York, it concluded that conflict of laws principles required it to "apply New Jersey law, when possible". <u>Id.</u> at 597. But the court found "no reported cases addressing the factors relevant to the nominee theory from New Jersey". <u>Id.</u> at 598. With the parties' agreement, the court therefore applied six factors drawn from caselaw in various jurisdictions by the District Court for the District of Montana in <u>Towe Antique Ford Found. v. IRS</u>, 791 F. Supp. 1450, 1454 (D. Mont. 1992). As listed by the court in <u>LiButti</u>, those factors are:

> (1) whether inadequate or no consideration was paid by the nominee;
> (2) whether the property was placed in the nominee's name in anticipation of a lawsuit or other liability while the transferor remains in control of the property; (3) whether there is a close relationship between the nominee and transferor; (4) whether the * * * [parties]

[*30] failed to record the conveyance; (5) whether the transferor retains possession; and (6) whether the transferor continues to enjoy the benefits of the transferred property.  * * *

LiButti, 894 F. Supp. at 598.[11]

### B.  Application of Factors

For the reasons explained below, consideration of the six LiButti factors supports SO Matthews' conclusion that Mrs. Hinerfeld holds the Larchmont residence as her husband's nominee.

---

[11]On the facts before it, the court in LiButti v. United States, 894 F. Supp. 589 (N.D.N.Y. 1995), vacated and remanded, 107 F.3d 110 (2d Cir. 1997), found only one of the listed factors (close relationship) to be present and thus concluded that Edith LiButti did not hold Devil His Due as her father's nominee.  The court also rejected the Government's argument that the stable business that owned the horse was an alter ego of Mr. LiButti on the grounds that the alter ego theory applied only to pierce the veil of a corporation and could not be applied to impute property of a proprietorship to its owner.  On appeal, the Court of Appeals for the Second Circuit viewed the District Court as having evidenced "an over-rigid 'preoccupation with questions of structure'".  LiButti, 107 F.3d at 119 (quoting Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 18 (2d Cir. 1996)).  The appellate court reasoned that "if Robert dominated and controlled Lion Crest [the stable] he should not be able to escape his tax liabilities simply because it was not incorporated, and he chose, instead, to constitute his daughter as his unincorporated business' nominee."  Id.

**[\*31]**      1.      Adequacy of Consideration

Petitioner has not established that Mrs. Hinerfeld paid any consideration for the Larchmont residence.[12]  None of the payments made by Mrs. Hinerfeld that petitioner and his attorney have, at various times, claimed to be the consideration for that transfer were made contemporaneously with the deed by which petitioner transferred to his wife title to the Larchmont residence.  The record includes no written documentation that specifically identifies those payments as bargained-for consideration for Mrs. Hinerfeld's acquisition of the residence.

Although petitioner and his attorney made conflicting claims about which of Mrs. Hinerfeld's payments in satisfaction of petitioner's liabilities constituted consideration for petitioner's transfer of the residence, they both ended up singling out Mrs. Hinerfeld's March 2002 payment of $300,000 to Commerce Bank and her $750,000 payment to Fleet Bank the following November.  Petitioner would thus have us believe that he and his wife entered into an agreement no later than March 2002 for her to acquire the Larchmont residence and that his conveyance to her in February 2003 satisfied a preexisting obligation.  New York law requires contracts for the sale of real estate to be in writing, N.Y. Gen. Oblig. Law sec. 5-703(2)

---

[12]Petitioner has the burden of proving that SO Matthews abused her discretion in rejecting his OIC.  See Rule 142(a); Titsworth v. Commissioner, T.C. Memo. 2012-12, 2012 WL 86670, at \*6.

**[\*32]** (McKinney 2018) ("A contract for * * * the sale * * * of any real property * * * is void unless the contract or some note or memorandum thereof, expressing the consideration, is in writing, subscribed by the party to be charged, or by his lawful agent thereunto authorized by writing."), and the record provides no evidence that petitioner and his wife committed their alleged agreement to writing. If petitioner and Mrs. Hinerfeld had entered into an oral agreement requiring him to transfer to her title to the Larchmont residence in consideration of the payments she made in March and November 2002, her part performance of that agreement might have enabled her to have a court compel petitioner's transfer of title despite the absence of a written agreement. See id., sec. 5-703(4) ("Nothing contained in this section abridges the powers of courts of equity to compel the specific performance of agreements in cases of part performance."). But the conflicting claims made by petitioner, his wife, and his attorney regarding the precise terms of the alleged agreement provide grounds for skepticism about the existence of an agreement with sufficiently clear terms to be specifically enforced.

In short, even considering the additional evidence presented at trial,[13] the record does not establish a clear enough nexus between petitioner's transfer of title

---

[13]If we were to decline to consider the Hinerfelds' trial testimony, we would have no explanation at all of the discrepancy in timing between the transfer of title and the payments that allegedly provided consideration for that transfer.

**[*33]** to the Larchmont residence and specific payments by Mrs. Hinerfeld for us to accept those payments as bargained-for consideration.

    2.    <u>Transfer With Retained Control in Anticipation of Liability</u>

Although Mrs. Hinerfeld admitted at trial that she had acquired title to the Larchmont residence to protect it from petitioner's creditors, petitioner argues that the second <u>LiButti</u> factor does not apply in the present case because "[t]he Larchmont residence was transferred to Ruth three years prior to the assessment of the tax liabilities in issue, and without any knowledge of the same." As articulated by the court in <u>LiButti</u>, 894 F. Supp. at 598, however, the factor applies if the transfer was made "in anticipation of a lawsuit or other liability". The transfer need not have been made in anticipation, or to avoid the collection, of the specific liability that the Commissioner seeks to have satisfied.

In the case of a transfer of title to residential property from one occupant to another, it is not obvious how one goes about determining whether the transferor retained "control" of the property after the transfer. The location of legal title would be unlikely to have a significant practical impact on the residents' use and enjoyment of the property.

Perhaps in recognition of that reality, the Federal District Courts in the Second Circuit, in applying the <u>LiButti</u> factors, have tended to equate possession

[*34] and control. For example, in Evseroff, 2012 WL 1514860, at *11, the District Court for the Eastern District of New York wrote: "Evidence in the record indicates that the second factor is satisfied in that * * * the property was transferred in anticipation of Evseroff's liability to the IRS and possibly his estranged wife, and Evseroff remained in possession and control of the Dover Street Residence." In Nassar Family Irrevocable Tr., the District Court for the Southern District of New York concluded that a trust to which a taxpayer had transferred an apartment held that property as the taxpayer's nominee. The court began its analysis by stating its finding "that the undisputed evidence demonstrates that * * * [the taxpayer] has exercised complete control over the Apartment and has retained all the benefits of ownership, suggesting that he, not the Trust, is the true owner of the property." Nassar Family Irrevocable Tr., 2016 WL 5793737, at *9. But at no point in its analysis did the court differentiate between possession and control. (In discussing the second LiButti factor, the court referred only to evidence that the taxpayer transferred the apartment to the trust in anticipation of the tax liabilities in issue and other liabilities.)

Without citing any caselaw on point, respondent seems to follow the same tack: essentially equating possession and control. In listing the reasons to believe that petitioner retained control over the Larchmont residence, respondent notes

[*35] that petitioner and Mrs. Hinerfeld have lived there since 1968 and that petitioner continued to pay at least some of the expenses relating to the property after transferring title to his wife. On the premise that Mrs. Hinerfeld acted at petitioner's direction in satisfying his liabilities, respondent asks us to infer that she also acted at his direction in paying household expenses. Petitioner counters: "[T]he fact that * * * [he] minimally supported the residence by paying insignificant expenses cannot be enough to establish his 'control over the property'".

But petitioner has failed to identify any respect in which his transfer to his wife of legal title to the Larchmont residence materially affected their use of the property. As respondent argues: "There is no indication in the record that the 'transfer' of the Larchmont residence to Mrs. Hinerfeld affected Petitioner's use of the property in any way." Certainly, petitioner remained in possession of the property. To the extent that possession can be equated with control, he also retained control of the property. And, again, Mrs. Hinerfeld admitted that she acquired title to the property in an effort to shield it from petitioner's creditors.[14]

---

[14]The administrative record alone provides sufficient evidence to support a conclusion that the Larchmont residence was placed in Mrs. Hinerfeld's name in anticipation of a lawsuit or other liability. SO Matthews, of course, did not have Mrs. Hinerfeld's trial testimony before her. SO Matthews seems to have inferred

(continued...)

**[*36]** For those reasons, we conclude that the second <u>LiButti</u> factor also weighs in favor of viewing Mrs. Hinerfeld as holding the Larchmont residence as petitioner's nominee.

### 3. Close Relationship

Petitioner admits that he and his wife have a "close relationship" but claims that, under the circumstances, their relationship ought to be a "neutral" factor. As he articulates his argument: "Although there is a 'close relationship' between the alleged nominee (Ruth) and Petitioner; and although Petitioner resides in the residence and enjoys its benefits, considering the marital relationship, and the fact

---

[14](...continued)
from the fact that the transfer of title to the Larchmont residence occurred while Thermacon's employment taxes were accruing that petitioner made the transfer to protect the residence from his personal liability for those taxes. Because she purported to apply the factors listed in IRM pt. 5.17.2.5.7.2(3), she apparently felt she had to establish that the transfer was "for tax avoidance purposes". But respondent did not assess any of the liabilities in issue until February 27, 2006, and the record provides no evidence that petitioner was aware of Thermacon's unpaid employment taxes before that date. In any event, under the <u>LiButti</u> factors, the relevant question is not whether the transfer in issue was motivated by a desire to avoid the particular tax liabilities in issue but simply whether the transfer was made to protect the property from liabilities. And the administrative record provides plenty of evidence that petitioner's transfer to his wife of title to the Larchmont residence was related to his and Thermacon's financial difficulties. Indeed, petitioner insisted to SO Matthews that his wife's payment of liabilities served as the consideration for the transfer.

**[*37]** that Ruth paid for almost all costs respecting the residence, it is submitted that these are neutral factors."

Petitioner's reasoning seems to be grounded on the premise that, whenever one spouse transfers a joint residence to the other, the transferor's continued use and enjoyment of the residence is to be expected. Given their relationship, the transferee is unlikely to send the transferor packing after securing title to the residence. The Court of Appeals for the Second Circuit recognized this reality in a bankruptcy case when it rejected the creditors' argument that the debtor's residing at property purchased by his wife and transferred to a trust evidences that the debtor was the property's equitable owner. Babitt v. Vebeliunas (In re Vebeliunas), 332 F.3d 85 (2d Cir. 2003). As the court observed: "[T]he mere fact that the debtor lived at Lattingtown Estate, along with his wife and family, without paying rent does not divest * * * [the wife] or the * * * [t]rust of ownership of the property, because a homeowner would be expected to allow her spouse and children to live rent-free in her home." Id. at 92. And we ourselves have noted that "[c]ourts * * * must be cognizant of letting a close relationship take precedence over all of the other factors" in determining whether a relative acts as nominee for a transferor. Dalton v. Commissioner, 135 T.C. at 416.

**[*38]** Certainly, "a close relationship between grantor and grantee does not necessarily make the grantee the grantor's nominee." Id. But rendering the close relationship factor neutral, as petitioner suggests, would go too far in the other direction. When other factors weigh in favor of treating one related party as the other's nominee, as in petitioner's case, the parties' relationship can and should provide further support for that treatment.

### 4. Recording of Conveyance

Although the copy of the deed by which petitioner transferred to his wife title to the Larchmont residence that is included in the record bears no evidence of recording, respondent does not contest petitioner's claim that "[t]he deed reflecting the transfer was properly recorded." On the basis of respondent's concession, we will treat the fourth LiButti factor as weighing against viewing Mrs. Hinerfeld as petitioner's nominee in holding title to the Larchmont residence.

### 5. Retention of Possession and Continued Enjoyment of the Transferred Property

In the case of property used as a residence, possession and continued enjoyment amount to the same thing. Thus, in the present case, the fifth and sixth LiButti factors collapse into one. And those factors both weigh in favor of treating Mrs. Hinerfeld as petitioner's nominee in holding title to the property. As

[*39] noted above, there is no evidence in the record that petitioner's transfer to his wife of title to the Larchmont residence significantly affected his possession or enjoyment of the property.

V.     Conclusion

Because all of the LiButti factors other than the recording of the deed weigh in favor of treating Mrs. Hinerfeld as petitioner's nominee in holding title to the Larchmont residence, SO Matthews' determination to that effect was not only reasonable but correct. Petitioner transferred the property to a person--his wife--with whom he had a close relationship. He failed to establish that Mrs. Hinerfeld paid adequate consideration for the property. Mrs. Hinerfeld admitted at trial that title to the Larchmont residence was placed in her name to protect the property from her husband's creditors (and the administrative record before SO Matthews gave her grounds to infer that to have been the case). Finally, petitioner failed to identify any respect in which the transfer of legal title to the residence affected his use or enjoyment of the property. Because Mrs. Hinerfeld can appropriately be

**[*40]** treated as petitioner's nominee in holding title to the Larchmont residence,

SO Matthews did not abuse her discretion in rejecting an OIC that did not reflect

the value of that property.

<u>Decision will be entered for</u>

<u>respondent</u>.